**John T. MURPHY, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES.**

No. 93–CV–2510 (JS).

United States District Court, E.D. New York.

Dec. 11, 1994.

---

David Kuznicki, New York City, for plaintiff.

Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY, Jennifer C. Boal, Asst. U.S. Atty., for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

This action is brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Secretary of Health and Human Services (the "Secretary") that denied plaintiff's application for disability insurance benefits under the Social Security Act (the "Act"). Both plaintiff and the Secretary have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Plaintiff argues that the Secretary failed to describe with specificity the reasons why plaintiff's claimed disability did not fall within the type of impairments automatically entitling plaintiff to disability benefits. That failure, plaintiff asserts, requires reversal of the Secretary's decision and remand for calculation of benefits. Alternatively, plaintiff claims that the Secretary failed fully to develop the medical evidence and that, accordingly, the case should be remanded for further development of the record. In its cross-motion, the Secretary argues that its decision was based upon substantial evidence and that the Court must affirm the Secretary's final determination.

## BACKGROUND

Plaintiff John T. Murphy is a 43–year–old male born on February 27, 1951. (Administrative Record ("R.") at 22, 51.) Murphy filed for disability insurance benefits on November 27, 1991, alleging that a knee injury and a breakdown of his artificial hip rendered him incapable of engaging in any substantial gainful activity after February 27, 1991. (R. at 51, 81.)

The record reflects that Murphy was struck by a five-ton truck at the age of ten. (R. at 81.) As a result of the accident, Murphy required surgery at age seventeen to replace his right hip. After the surgery, Murphy's right leg was four and one-half inches shorter than his left, and his right knee was two inches smaller than his left. (R. at 99.) The surgery was unable to alleviate the recurring pain Murphy alleges he feels in his hips, legs, and back. (R. at 9, 29.) Indeed, Murphy claims in his written application for disability benefits that the pain escalated following the hip replacement and that he now experiences constant pain. (R. at 35, 81.)

Murphy completed school through the ninth grade. (R. at 27, 85.) In addition to various odd jobs, Murphy worked steadily as a dispatcher for an auto body and towing company from 1983 to 1984 and from 1986 to 1991. (R. at 28, 85, 86.) As a dispatcher, Murphy monitored incoming phone calls and dispatched toll trucks to the police department. (R. at 29.) Murphy voluntarily stopped working in February 1991 after his duties were altered to include walking back and forth to inspect cars and trucks brought into the shop. (R. at 30.)

Murphy underwent an examination by Dr. K. Seo, an impartial consultant, on January 10, 1992 in order to facilitate the processing of his disability request. Dr. Seo concluded that Murphy had a right total hip replacement and a left hip nailing for slipped femoral epiphysis and that "functionally, patient may be able to stand and walk for 30 minutes and carry 20 lbs." (R. at 100.) Seo made no mention of plaintiff's ability to sit. (R. at 98–100.)

On June 30, 1992, at the request of plaintiff's attorney, Murphy was examined by an-

other consultant, Dr. Solomon Bieninstock, whose prognosis was more guarded. (R. at 104–107.) Dr. Bieninstock found that "[b]ecause of the traumatic injury that the patient received in the accident, he is precluded from heavy lifting and sitting or standing for long periods of time" and that "it can be stated with reasonable medical certainty, that these conditions are chronic, permanent and disabling in nature." (R. at 107.)

Plaintiff's application for disability benefits was both denied initially (R. at 64) and on reconsideration (R. at 71). Plaintiff then requested a hearing regarding his application, which was held before administrative law judge Sol A. Wieselthier (the "ALJ") on June 18, 1992.

At the hearing, Murphy testified that his right hip is "numb basically all the time now." (R. at 34–35.) He also indicated that he can only sit for about 20–30 minutes at a time (R. at 39), walk, with the help of a cane, at most one or two blocks (R. at 37) and stand for no more than one-half hour before feeling considerable pain in his knees and right hip (*Id.*). Murphy did state that he could lift up to 25 pounds without a problem. (R. at 40.) Despite his alleged persistent pain, Murphy has not received since his surgery any additional medical treatment of the injuries he endured from the accident. (R. at 20, 45, 47.) Murphy did indicate, however, that in order to become eligible to receive welfare benefits in 1991, he was examined by HS Systems, a group of welfare consultative physicians located in New York City. (R. at 32, 49.)

In an opinion rendered on December 17, 1992, the ALJ found that although Murphy "has impairments that affect his ability to perform work related activity" (R. at 12), he "retains the residual functional capacity to perform his past relevant work" and thus was "not under a 'disability' as defined in the Social Security Act" (R. at 9). Relying heavily on Dr. Seo's report, the ALJ held that Murphy's complaints were not consistent with the medical evidence and concluded that Murphy could continue to work as a dispatcher. (R. at 9, 13.) On April 30, 1993, the Appeals Council denied plaintiff's request for a review (R. at 2–3), and this action followed.

## DISCUSSION

The legal principles governing the Court's decision on the instant motions are well settled. A claimant is entitled to disability benefits under the Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (1988); *see also Wagner v. Secretary of Health and Human Serv.*, 906 F.2d 856, 860 (2d Cir.1990). The presence of an impairment is thus not in and of itself disabling within the meaning of the Act. *See Spears v. Heckler*, 625 F.Supp. 208, 210 (S.D.N.Y.1985).

The Secretary has promulgated regulations establishing a framework in which to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). Essentially, a five-step analysis of the claimant's alleged disability is to be made:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secre-

tary then determines whether there is other work which the claimant could perform. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982) (per curiam). The claimant bears the burden of proof as to the first four steps, while the Secretary bears the burden of proof as to the last step. *See id.; Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir.1984); *Vasquez v. Secretary of Health and Human Serv.*, 632 F.Supp. 1560, 1563 (S.D.N.Y.1986).

■ In evaluating the ALJ's ruling, the Court does not review the administrative record *de novo* but rather considers only whether the Secretary's findings are supported by substantial evidence. 42 U.S.C. § 405(g) (1988); *see also Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991); *Wagner*, 906 F.2d at 860; *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir.1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); *see also Wagner*, 906 F.2d at 860 (citing *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427). "The substantial evidence test ... applies not only to the Secretary's findings of fact, but also the inferences and conclusions of law to be drawn from such facts." *Smith v. Shalala*, 856 F.Supp. 118, 121 (E.D.N.Y. 1994) (internal quotations and citations omitted); *see also Vasquez*, 632 F.Supp. at 1563 (citations omitted); *Rodriquez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977) (citations omitted).

■ Applying the aforementioned standards, plaintiff's argument that the ALJ should have specified why plaintiff's alleged disability did not fall within the impairments listed in Appendix 1, Subpart P, Part 404, Title 20 of the social security regulations, thereby automatically entitling plaintiff to disability benefits, is without merit. The record reflects that neither plaintiff nor his attorney raised during the hearing any claim that plaintiff's disability fell within the listed impairments, even though plaintiff bore the burden of proof on this issue. The record also indicate that the ALJ did not ignore the issue but specifically found that plaintiff "does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." Certainly, the ALJ cannot be faulted for failing to provide a detailed explanation comparing plaintiff's disability to the listed impairments given that the ALJ did not carry the burden of proof on this issue and no evidence had been proffered relating thereto.

■ The ALJ's conclusion regarding plaintiff's residual functional capacity is more problematic. The ALJ did not reach the question of whether Murphy was able to perform other work in the national economy, as he concluded that Murphy was capable of returning to his prior employment as a dispatcher. (R. at 13.) Accordingly, our review of the record is limited to the ALJ's findings that plaintiff failed to meet his burden of showing his incapacity to return to the "kind of work" he had done previously. 20 C.F.R. § 404.1520. The reference to "kind of work" requires not only that plaintiff show an inability to return to his last job but also that he "is unable to return to his former type of work." *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir.1981) (internal quotations and citations omitted).

In concluding that plaintiff could return to former work as a dispatcher, the ALJ found this work to be sedentary in nature and that plaintiff retained "the ability to sit for prolonged periods and ... to perform a full range of sedentary work." (R. at 12.) Social security regulations define "sedentary work" as "lifting no more than 10 pounds at a time and occasional lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a) (1994). "By its very nature 'sedentary' work requires a person to sit for long periods of time ..." *Carroll v. Secretary of Health and Human Serv.*, 705 F.2d 638, 743 (1983) (citing 20 C.F.R. § 404.1567(a)); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir.1984) (citing *Car-*

*roll v. Secretary of Health and Human Services,* 705 F.2d 638 at 643) (2nd Cir.1983).

In making his determination that plaintiff could perform the sedentary tasks his former job required, the ALJ placed considerable weight on Dr. Seo's medical examination and discounted the report written by Dr. Bieninstock. Although Dr. Bieninstock's physical findings were indeed less detailed than those made by Dr. Seo, Dr. Bieninstock did list the bodily systems he examined, showing that he conducted a full physical examination of plaintiff. Moreover, Dr. Bieninstock was careful in noting that his diagnoses rested not only on plaintiff's subjective assertions regarding his condition but also on physical findings: "[t]he patient demonstrates objective and subjective findings consistent with residual inflammatory changes to the muscular and supportive structures of the lower back, left knee and hips ... This inflammatory change within the nerve root is chronic and expected to be of a permanent nature." (R. at 106.) Thus, Dr. Bieninstock appears, no less than Dr. Seo, to have drawn his conclusions from physical findings as well as a medical history.

In discounting Dr. Bieninstock's report, the ALJ noted that it "is contradicted by," *inter alia,* "the medical findings which disclose minimal positive findings of the spine, ..." (R. at 12.) The Court assumes that the reference to "medical findings" is to the X-ray analysis accompanying Dr. Seo's report which showed only "slight lumbar dextroscoliosis" and "minimal disc narrowing." (R. at 101.) It is, however, "well established that a physician's medical assessment need not be supported. by 'objective clinical or laboratory findings' to merit consideration by the Secretary." *Spears,* 625 F.Supp. at 215 (citations omitted). Therefore, Dr. Bieninstock's report certainly cannot be discarded on this basis. Moreover, since the ALJ fails to discuss whether X-ray analysis is more probative than a physical examination in determining the extent of plaintiff's back problems, the Court cannot find that, because Dr. Seo's report was accompanied by an X-ray analysis, it was more worthy of weight than the report prepared by Dr. Bieninstock.

In fact, Dr. Seo's failure to specify whether plaintiff was capable of sitting for prolonged periods of time renders Dr. Seo's report practically useless in determining plaintiff's capacity to perform his former sedentary tasks. Dr. Seo's report noted only plaintiff's ability to stand and walk. (R. at 100.) Dr. Bieninstock, on the other hand, specifically stated, "I have advised Mr. Murphy of the long term complication of these injuries, he cannot walk, stand or sit for a proloned [sic] period of time." (R. at 107.) From Dr. Seo's silence and despite Dr. Bieninstock's report to the contrary, the ALJ somehow drew the negative inference that plaintiff was capable of the prolonged sitting required in performing sedentary tasks. The Court cannot agree, particularly in light of *Dr.* Bieninstock's express inapposite findings, that Dr. Seo's silence is probative of plaintiff's capacity to sit and, thereby, of returning to his prior line of work. *See e.g. Ferraris,* 728 F.2d at 586 (evidence not sufficient to hold claimant can do sedentary work, as finding that Ferraris could not do any prolonged standing or frequent lifting of more than 10 pounds does *not* automatically lead to the conclusion that Ferraris *could* do sedentary work as defined in the regulations). Accordingly, the Court finds that Dr. Seo's report in and of itself does not constitute substantial evidence supporting the ALJ's conclusions.

The ALJ also relied heavily on plaintiff's testimony as a further basis for finding that plaintiff was capable of returning to his prior work and therefore was not disabled. The ALJ noted that plaintiff testified to not having visited a physician since his surgery, not taking prescribed pain medication and being able to read, watch television and attend movies. Plaintiff's testimony, however, is simply not clear enough to constitute, even together with Dr. Seo's report, substantial evidence that plaintiff was able to return to his prior work as a dispatcher.

Although plaintiff acknowledged not having sought medical attention since his surgery, he indicated that he had not done so because he had not had funds to pay for medical services. (R. at 31.) He also stated that he did not apply for Medicaid because, whether rationally or not, he was "afraid I'm

going to go in a hospital and come out dead." (R. at 35.)

Plaintiff's failure to obtain prescribed pain medication did not mean that any pain he endured was adequately resolvable with the over-the-counter medicines he was taking. In fact, plaintiff testified otherwise:

Q   Okay. Now when you get the pain—

A   Yeah.

Q   —how do you best relieve it?

A   Usually what I do it [sic] I try to just hypnotize myself basically. My favorite thing is, I pretend to have a large book in front of me called pain, and as I turn the pages I try to make the pain go away.

Q   You bear it out.

A   Yeah, and if I can lay down and not be bothered by any noise anybody, it'll usually work, otherwise, it's a big problem.

(R. at 21–2.) Plaintiff also commented that "about 30 percent of the day my left knee will bother me ..." (R. at 16.)

The fact that plaintiff could read and watch television and movies also does not necessarily support the ALJ's conclusion that plaintiff was capable of sedentary work. There was no proof that plaintiff always engaged in these activities while sitting and that he did so for sustained periods comparable to those required to continue working as a dispatcher. *Carroll,* 705 F.2d at 643 (noting, in discussing similar activities, that "[t]here was no proof that [the plaintiff] engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job."). Even though the plaintiff acknowledged that he "[s]ometimes if it's hot" went to movies (R. at 43), he also stated that "[a] lot of times I've gone to movies and I've had to leave in the middle of it (R. at 43)."

Plaintiff's work as a dispatcher from 1983 until 1984 and from 1986 until 1991 also fails to sustain a finding of no disability. In response to a question from his attorney, plaintiff did state that he quit his work as a dispatcher because his tasks changed, requiring him to walk and stand more than previously. (R. at 30.) Plaintiff later in his testimony, however, noted that his condition had also worsened. (R. at 86.) Plaintiff testified, "my right hip, it's, it's, it's numb *basically all*

*the time now, which has got me nervous,* but sometimes it gets to a point where I really can't feel anything." (R. at 35 (emphasis supplied).) Plaintiff's written requests for disability also state that his pain symptoms had increased. (R. at 81 and 86.) Moreover, when specifically asked by his attorney "Could you go back to work as a dispatcher if you didn't have to walk outside to inspect cars coming in?" plaintiff responded, "I don't thinks so because I wouldn't be able to do the eight hours sitting down. That would be a problem." (R. at 47 and 48.)

■ The paucity of evidence on plaintiff's ability to sit for prolonged periods and therefore resume his past work is particularly troubling given the ALJ's references to an additional medical evaluation, that was prepared by HS Systems in 1991 in connection with plaintiff's application to obtain welfare benefits, that was never made a part of the administrative record. This report was brought to the ALJ's attention during the administrative hearing (R. at 32–33, 49), and the ALJ stated that the report would be used in his determination of the plaintiff's status: "Atty: Do you intend to get the—what you refer to as the HS System report? ALJ: Yes, we're going for that too." (R. at 49.) Although plaintiff could have issued a subpoena for the document himself, "when it is reasonably necessary for the full presentation of a case, an administrative law judge ... on his or her own initiative ... [may] issue subpoenas for ... documents that are material to an issue at the hearing." 20 C.F.R. § 404.950(d) (1994). The ALJ appears from the Court's reading of the record to have committed himself to obtaining the report.

The ALJ had requested that the plaintiff supply his welfare number so as to expedite retrieval of the HS Report. (*Id.* at 32–33, 49.) The record is unclear as to whether this information was ever given to the ALJ. In any event, the ALJ seemed to imply that he would obtain the report even if plaintiff failed to provide his welfare number:

Atty: Do you intend to get the—what you refer to as the HS System report?

ALJ: Yes, we're going for that too.

Atty: Okay.

ALJ: ... What we need, what we need from you the number [sic], it'll help.

Given the meager record, the ALJ should have reviewed the report or at least noted why it was not obtained.

## CONCLUSION

In sum, the Court finds the administrative determination below not to have been supported by substantial evidence. The medical evidence and plaintiff's testimony are simply too inconclusive to allow for such a finding. The Court declines, however, to rule in plaintiff's favor but rather reverses the ALJ's ruling and remands the case for further development of the administrative record, including consideration of the aforementioned report prepared by HS Systems. *See Spears*, 625 F.Supp. at 214 ("remand is necessary because the record reveals that the ALJ either overlooked or ignored relevant medical evidence in assessing the nature and severity of plaintiff's impairments"). Accordingly, the Secretary's motion for judgment on the pleadings is denied, and the cross-motion by plaintiff for the same is likewise denied to the extent it requests a reversal and remand for computation of benefits. The case is remanded pursuant to 42 U.S.C. § 405(g) for a rehearing consistent with this Memorandum and Order.

SO ORDERED.