**Gertrude WOODFORD, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 97 Civ. 9450(RLC).**

United States District Court, S.D. New York.

May 1, 2000.

---

522

Robert M. Brigantic, New York City, for Plaintiff, Robert M. Brigantic, of counsel.

United States Attorney for, the Southern District of New York, New York City, for Defendant, Linda A. Riffkin, Asst. United States Attorney, of counsel.

*OPINION*

ROBERT L. CARTER, District Judge.

Claimant, Gertrude Woodford ("Woodford"), brings this action pursuant to 42 U.S.C. § 405(g) to challenge the final determination of defendant, the Commissioner of Social Security ("Commissioner"), denying her Supplemental Security Income Disability benefits ("SSDI"). Both parties move under Rule 12(c), F.R. Civ. P., for judgment on the pleadings.

## I. BACKGROUND

### A. Procedural History

Woodford applied for disability benefits on October 27, 1993, alleging that she was disabled since May 7, 1993, due to residual injuries stemming from a fractured left ankle. (Tr. at 32).[1] Woodford's claim was denied on the initial and reconsideration levels. (*Id.*). Woodford appealed the reconsideration denial, and requested a hearing with an Administrative Law Judge ("ALJ"). (*Id.*). ALJ David Nisnewitz heard Woodford's case on October 24, 1995. (Tr. at 54–83). In a decision, dated January 24, 1996, the ALJ found that Woodford had the residual functional capacity to perform her prior job as a bookkeeper and other kinds of sedentary work,[2] and therefore she was not disabled under the SSDI guidelines, and was not entitled to benefits. (Tr. at 33, 36). On March 8, 1996, Woodford requested that the Appeals Council review the ALJ's decision. (Tr. at 28). The Appeals Council denied her request, making the ALJ's decision final. (Tr. at 2–4). Woodford then filed the instant claim under 42 U.S.C. § 405(g), requesting review of the ALJ's and the Appeals Council's decisions.

### B. Administrative Hearing Facts

Woodford is a 59 year old woman, with two years of college education. (Tr. at 66–

70). From the date she immigrated to the United States in 1962, until the date of her injury, May 7, 1993, Woodford was steadily employed as a bookkeeper. (Tr. at 65–78). Woodford's bookkeeping jobs primarily required her to record financial information while sitting at a desk, and occasionally to walk around the office in order to retrieve financial information. (Tr. at 67–70).

On May 7, 1993, Woodford fell into a roadside drainage ditch outside her daughter's Westchester County home and fractured her left ankle. (Tr. at 60–61). She was taken to Northern Westchester County Hospital and a surgeon, Dr. Mark Altman, diagnosed her as having suffered an "open, Grade II, bi-malleolar equivalent left ankle fracture." (Tr. at 128). Dr. Altman performed an "open reduction and internal fixation to the [left] fibula:" he installed a metal plate and six screws in the ankle to increase ankle stability during the healing process. (Tr. at 128–29, 152). He also sutured Woodford's deltoid ligament in two places. (Tr. at 129). Woodford was in the hospital for three days, and convalesced with her daughter in Westchester County for three months. (Tr. at 62). During this period, Dr. Altman prescribed antibiotics and pain medication. (Tr. at 63–64, 133).

### 1. Treating Physician's Reports

Woodford ultimately moved back into her Elmhurst, New York apartment and, on January 24, 1994, sought treatment from an osteopath, Dr. William J. Kulak, M.D., who thereafter served as her treating physician. (Tr. at 35, 64).

In his initial report, dated March 21, 1994, Dr. Kulak indicated that Woodford complained of intermittent pain in her ankle and knees while flexing and while walking. (Tr. at 150). He also noted that she walked with a slow gait. (*Id.*). Dr.

---

1. Tr. refers to the Transcript and Administrative Record of the proceedings on Gertrude Woodford's Social Security case, filed August 29, 1998.

2. Residual Functional Capacity refers to what a claimant can do despite her impairments. *See* 20 C.F.R. § 404.1545(a).

Kulak diagnosed Woodford as having a series of ankle injuries, including: an ankle fracture, and inflammation of the soft tissues, ligaments and tendons in the left ankle.[3] (Tr. at 152). He determined that Woodford's injuries constituted a partial disability that limited the use of her left ankle and foot.[4] (Tr. at 153).

Dr. Kulak also indicated that a long term prognosis for Woodford could not be developed at such an early stage in her treatment; however, he predicted that there was a strong probability that she would suffer long term injury, including: permanent loss of ankle flexibility, recurring pain symptoms, and ankle inflammation. (Tr. at 152–53). He noted that it was unclear when Woodford would be able to resume work or recreational activities. (Tr. at 153). For the initial treatment period, he prescribed stretching exercises, anti-inflammatory drugs, and recommended the use of a cane. (Tr. at 151, 153).

Dr. Kulak's follow-up report, dated April 4, 1995, summarized medical examinations conducted on August 22, November 7, and December 19, 1994, and April 3, 1995. (Tr. at 144–48). Dr. Kulak indicated that, at the four examinations, Woodford complained about various kinds of left ankle pain, specifically: pain which radiated to her calf, and caused twitching and tightness in her calf muscles when walking, (Tr. at 144); pain which caused a "tired" feeling in her right lower extremity and back, and intense "sleepy" sensations in her left foot, (Tr. at 145); and calf and left ankle cramps that caused her to lose her balance and fall. (*Id.*). Consistent with these symptoms, Dr. Kulak noted that Woodford was still experiencing pain on "heel to heel" and "toe to toe" walking. (Tr. at 146).

At each of the four examinations, Dr. Kulak conducted flexibility tests on Woodford's ankles. He determined that Woodford's range of motion in her left ankle was increasing, but that flexing, rotation and palpitation of the left ankle still produced pain. (Tr. at 145). X-rays he ordered in November, 1994, confirmed that Woodford's ankle fracture had healed, but that scar tissue, calcification or bone fragments had accumulated around ligaments at the injury site. (*Id.*). Dr. Kulak noted that these deposits could be expected to cause secondary symptoms such as pain and inflammation. (Tr. at 146). Additionally, he indicated that scar tissue was causing decreased sensation in part of Woodford's ankle. (*Id.*). At all of the examinations, Dr. Kulak prescribed the same course of treatment: anti-inflammatory drugs, physical therapy, and stretching exercises. He also recommended the use of a cane and/or air cast when walking long distances and climbing stairs. (Tr. at 145).

At the close of the April, 1995, report, Dr. Kulak added several diagnoses to his initial assessment of claimant's condition. He indicated that Woodford would have limited flexibility of the left ankle, and intermittent inflammation of various left ankle tendons and tissues. Additionally, he noted that she would continue to develop calcium deposits and scar tissue at the ankle injury site, and suffer loss of sensation to the scarred areas.[5] (Tr. at 147).

---

3. Dr. Kulak's specific diagnoses included the following: "status post fracture distal fibula, requiring open reduction with internal fixation"; "loss of dorsiflexion of the left ankle"; "residual inflamation deltoid ligament left ankle"; "soft tissue swelling deltoid and distal fibula areas of the left ankle"; "tibialis posterior tendinitis of the left ankle"; "peroneal brevis tendinitis left ankle"; "synovitis and quadriceps tendinitis left knee"; and "Achilles tendinitis and bursitis posterior aspect left ankle." (Tr. at 152).

4. Dr. Kulak diagnosed Woodford as having a "partial disability" for the purposes of Woodford's worker's compensation claim; this determination did not establish that Woodford was disabled under the SSDI guidelines. *See Rosado v. Shalala*, 868 F.Supp. 471, 473 (E.D.N.Y.1994).

5. Dr. Kulak diagnosed claimant as having the following injuries: "Status post fracture distal left fibula, with deltoid disruption, with open wound, requiring internal fixation"; "Inhibited full range of motion left ankle";

Dr. Kulak concluded that Woodford would continue to need a cane to walk distances and climb stairs, and that she would need to wear the air cast when performing strenuous household tasks. (Tr. at 148).

## 2. Consulting Physicians' Reports

Consulting physicians' reports describing Woodford's condition were also admitted into the administrative record. Dr. Kyung Seo, who examined Woodford for the New York Office of Disability, submitted reports regarding his February 25, and September 20, 1994 examinations of claimant. In summary, Dr. Seo's reports indicated that: Woodford had a mild limp stemming from a left leg injury; her left ankle joint was swollen; she showed no atrophy of the thighs and lower legs; her left leg and ankle were less flexible than her right leg and ankle; and she had difficulty in "toe to toe" and "heel to heel" walking because of pain in her left ankle. (Tr. at 136–137, 140–42). Dr. Seo also observed that Woodford had no difficulty standing from a sitting position, or getting on or off the examination table. (Tr. at 136, 140). Dr. Seo diagnosed Woodford as having several of the same ankle injuries that Dr. Kulak diagnosed, but also determined that Woodford suffered from "post traumatic degenerative osteoarthritis of the left ankle." (Tr. at 138). Dr. Seo concluded that Woodford's pain and limited range of ankle flexibility would make it difficult for her to stand, walk and carry heavy objects. (*Id.*).

Dr. James Dickson also submitted a report; he examined Woodford for the company that constructed the drainage ditch she fell into, in connection with Woodford's personal injury lawsuit against the company. (Pl. Mem. at 17–18).[6] Dr. Dickson's report, dated March 2, 1995, indicated that: Woodford could only walk without her cane in a painful heel to toe gait; she was able to get on and off the examination table with no difficulty; the wear patterns on her shoes showed that she was using an air brace support on the left side; and her left calf was a half inch smaller than her right calf. (Tr. at 155–56). Dr. Dickson's ankle flexibility examination revealed that Woodford had less flexibility in the left ankle than the right, felt pain on her left side when flexing, and that both of her Achilles tendons were tight. (*Id.*) Additionally, X-rays showed that there was a remaining sliver of broken bone at the ankle injury site. (Tr. at 155). Dr. Dickson diagnosed Woodford as having a residual disability from her accident. (Tr. at 156). He indicated that Woodford would feel weakness in her ankle and have restricted motion, but concluded that if the hardware in her ankle was removed, and she engaged in physical therapy, her condition could improve. (*Id.*).

Woodford also testified at the administrative hearing, describing the abovementioned work history and the treatment of her injuries, the restrictions her injury had placed on her lifestyle, and her subjective feelings of pain. (*See, e.g.,* Tr. at 63–67, 80–81).

## B. Appeals Council Evidence

After the ALJ issued an unfavorable decision on her claim, Woodford submitted supplementary medical evidence to the Ap-

---

"Intermittent inflamation deltoid ligament left ankle"; "Intermittent tibialis posterior tendinitis"; "Anterior talofibular ligament inflammation with overlying mass"; "Calcification lateral collateral ligament, left ankle"; (continued on next page ... ) "Necessity for cane, right hand, and air cast brace left ankle"; "Intermittent peroneal tendinitis, brevis, left ankle"; "Secondary Achilles bursitis, left ankle; Secondary greater trochanteric tendinitis and bursitis, left lateral pelvis"; and "Diminished sensation overlying medial

traumatic scar and surgical intervention." (Tr. at 147).

6. Pl. Mem. refers to *Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings,* filed December 4, 1998. Def. Mem. refers to *Defendant's Memorandum of Law in Support of His Cross–Motion for Judgment on the Pleadings,* filed February 24, 1999.

peals Council: two treatment letters Dr. Kulak wrote in February, 1997, (collectively "February, 1997 letters"), and a series of reports prepared in 1996 by Dr. Bernard B. Abramovici, her family physician. (Tr. at 6–8).

The first piece of supplementary evidence from Dr. Kulak was a letter, dated February 3, 1997, which summarized claimant's condition at examinations conducted on January 11 and April 22, 1996, and January 22, 1997. In the letter, Dr. Kulak indicated that Woodford complained of various pain symptoms at the three examinations: left ankle pain when moving and when at rest, left ankle pain in cold weather, and left ankle numbness. (Tr. at 10–11). Additionally, she complained about left ankle instability. (Tr. at 11). Dr. Kulak also summarized the results of claimant's physical examinations, and reported that Woodford felt pain upon palpitation of various parts of the left ankle, had diminished sensation in her left ankle, and less flexibility in the left ankle than the right. (*Id.*). Additionally, he observed that Woodford still experienced pain in "heel to heel" and "toe to toe" walking. (*Id.*) Dr. Kulak prescribed the same course of treatment at the three examinations: he advised Woodford to continue using anti-inflammatory drugs, go to physical therapy, engage in stretching, and to use her cane and air cast. (Tr. at 10).

Dr. Kulak also amended his diagnosis in the February 3, 1997 letter. He concluded that Woodford's ankle fracture was healing in a manner that was causing ligament thickening and scarring, and that these pathologies would cause intermittent in-flammation in the ankle tendons and ligaments, and would cause pain. (Tr. at 12). He also determined that Woodford would have diminished sensation in certain ankle nerves, would have decreased ankle flexibility, and that the hardware in her ankle would cause pain.[7] (*Id.*). Dr. Kulak concluded that these injuries constituted a "permanent partial disability" that limited Woodford's ability to climb stairs, walk distances, carry loads and squat, and that her injuries would likely "preclude her from performing the duties of her prior occupation in a capacity of gainful employment." (Tr. at 13). The second letter from Dr. Kulak, dated February 12, 1997, indicated that Woodford was Dr. Kulak's patient and could not remain seated "for periods [of] ½ hour to 40 minutes." (Tr. at 9).

The last submission to the Appeals Council was a collection of examination notes written in 1996 by Dr. Abramovici. The notes are largely illegible, but they confirm that in 1996 Woodford walked with an unsteady gait. (Tr. at 14–18).

## II. LEGAL ANALYSIS

### A. Right of Appeal to the Appeals Council

■ The Commissioner argues that the supplementary evidence Woodford submitted to the Appeals Council was insufficient to trigger review of the ALJ's decision because the evidence did not meet the requirements of 20 C.F.R. § 404.970(b): it was not new, material evidence regarding her condition prior to the ALJ's decision.[8] (Def. Mem. at 17–18). When a claimant presents evidence that

---

**7.** Dr. Kulak's specific diagnoses included the following: "Thickening and inflammation to the tibialis anterior tendon"; "Extensor hallux tendinitis; left foot"; "Diminished sensation medial calcaneal nerve distribution"; "Intermittent extenor tendinitis, lateral component left ankle"; "Intermittent deltoid ligament inflamation, anterior third"; "Chronic anterior talofibular ligament inflammation left ankle"; "Peroneal tendinitis left ankle"; "Intermittently symptomatic hardware, lateral"; "Intermittent metatarsalgia, left foot";

"Secondary plantar fascitis, left foot". (Tr. at 12).

**8.** The Appeals Council may decline a claimant's request for review, or grant the request for review and make a substantive decision regarding whether the claimant is entitled to benefits. 20 C.F.R. § 404. 981. In this case, the Appeals Council declined to review Woodford's claim. (Tr. at 3–4).

meets section 404.970(b)'s standards, the Appeals Council will admit the evidence into the administrative record, and review the entire record to determine whether the ALJ's decision is contrary to the weight of the evidence. *See Perez v. Chater,* 77 F.3d 41, 44 (2d Cir.1996).[9]

■ Specifically, the Commissioner contends that Dr. Kulak's February, 1997 letters concerned claimant's condition after January 24, 1996, the date of the ALJ's decision, and therefore were barred under section 404.970(b). (Def. Mem. at 17). This contention is in error. Although the February 3, 1997 letter discussed two examinations that took place after the date of the ALJ's decision—examinations on April 22, 1996, and January 22, 1997—these examinations helped Dr. Kulak make a retrospective, clarifying diagnosis of Woodford's pre-hearing condition. *See Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991) (recognizing that post hearing medical examinations may be admitted under 20 C.F.R. § 404.970(b) when these examinations assist in understanding a claimant's pre-hearing disability); *Dousewicz v. Harris,* 646 F.2d 771, 774 (2d Cir.1981) (same). Indeed, in the February 3, 1997 letter, Dr. Kulak explicitly stated that the diagnoses listed were "addendums or additions to those listed in previous reports." (Tr. at 12). He also indicated in his initial report on Woodford's condition that it was impossible to provide a long term diagnosis for her early in her treatment. (Tr. at 153). Furthermore, he had partially updated his

diagnosis of plaintiff on one occasion in a report that was already part of the administrative record. (Tr. at 147). In light of these facts, the Appeals Council should have recognized that the February 3, 1997 letter provided another clarifying diagnosis.[10]

The February 12, 1997 letter also clarified the scope of claimant's pre-hearing disability. The letter filled a gap in the discussion in Dr. Kulak's February 3, 1997 letter concerning claimant's work-related capabilities. (Tr. at 9). Specifically, the February 3 letter discussed how claimant's injuries reduced her ability to stand, squat and walk, and generally indicated that Woodford's limitations would prevent her from returning to her previous occupation as a bookkeeper. (Tr. at 11). The February 12 letter explained why Dr. Kulak believed that Woodford could not return to her prior job: because her injuries prevented her from remaining seated for more than thirty to forty minutes at a time.

Since it is clear that Dr. Kulak's February, 1997 letters concerned Woodford's pre-hearing medical condition, the remaining question is whether the letters contained new and material information. The court's review of the February, 1997 letters indicates that the letters provided new medical findings. In the letters, Dr. Kulak converted his early diagnoses of temporary ankle problems into more permanent diagnoses of ankle injury, and provided his professional opinion regarding Woodford's

---

**9.** Both Dr. Seo's and Dr. Kulak's pre-hearing reports established that Woodford walked unsteadily and with a limp; therefore, Dr. Abramovici's comment about her unsteady gait was merely cumulative, and his reports did not provide a sufficient basis to review the ALJ's decision. *See Fernandez v. Apfel,* 1999 WL 1129056 at *3 (E.D.N.Y.1999).

**10.** Contrary to the Commissioner's assertion, Dr. Kulak did not attempt in the February 3, 1997 letter to introduce new injuries into claimant's disability claim. *See Brown v. Chater,* 932 F.Supp. 71, 75 (S.D.N.Y.1996) (Chin, J.) (explaining that evidence regarding a new kind of injury cannot serve as the basis

for appeal of an ALJ's decision denying claimant benefits). Dr. Kulak did mention in the letter that Woodford had developed a right shoulder problem stemming from the use of her cane. (Tr. at 11). However, the majority of the letter focused on Woodford's original complaints about her left ankle injuries, and how these injuries affected her work-related abilities. (Tr. at 10–11). Indeed, the letter's primary purpose was to explain that Dr. Kulak's early concerns had come to fruition: scar tissue, calcification and other pathologies at the ankle fracture site had caused permanent complications. (Tr. at 147).

capacity to engage in work-related activities, such as walking, siting, squatting and standing. (Tr. at 12–13). Also, the letters contained information material to Woodford's claim.

■ The Commissioner is required to consider medical reports with specific findings about a claimant's work-related abilities when making a residual functional capacity determination, *see Murphy v. Sec. of Health & Human Servs.*, 872 F.Supp. 1153, 1158 (E.D.N.Y.1994), and no other report admitted into the administrative record provided as detailed findings about Woodford's work-related abilities as the February, 1997 letters. In short, the court finds that the February, 1997 letters met the requirements of 20 C.F.R. § 404.970(b), and that the Appeals Council erred when it determined that this evidence was insufficient to trigger review of the ALJ's decision.

### B. The ALJ's Decision

■ In addition to the error committed at the Appeals Council level, claimant contends that the ALJ erred when he denied her claim for benefits.[11] (Pl. Mem. at 23). "[J]udicial review of the Commissioner's denial of benefits is strictly limited." *See Richardson v. Apfel*, 44 F.Supp.2d 556, 560 (S.D.N.Y.1999) (Carter, J.). The court will not review de novo whether the claimant is disabled. *See id.* Rather, it will only set aside the Commissioner's decision if the decision is based on legal error or is not supported by substantial evidence in the record as a whole. *Id.* A decision is supported by "substantial evidence" when it is supported by enough relevant evidence that a reasonable mind could accept that evidence as adequate to support a conclusion. *Boyd v. Apfel*, 1999 WL 1129055 at *2 (E.D.N.Y. Oct. 15, 1999). When the

court reviews an ALJ's decision after the Appeals Council has declined review, it examines the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision. *See Whitfield v. Apfel*, 87 F.Supp.2d 196, 200 (E.D.N.Y. 2000).

An ALJ's determination regarding whether to award a claimant SSDI benefits is guided by 42 U.S.C. § 423(d). The statute requires that claimant show that he is unable "to engage in any substantial gainful activity by reason of . . . [a] medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Utilizing the five step procedure promulgated by the Social Security Administration, ALJ Nisnewitz found: (1) that Woodford was not engaged in substantial gainful activity, and had not been engaged in substantial gainful activity since the date of her accident; (2) that Woodford's impairment "impose[d] significant vocationally relevant limitations," and was therefore severe; (3) that Woodford's impairments did not meet or equal the listed impairments in Appendix One of the regulations, including 1.00—Musculoskeletal System; and (4) that Woodford could perform her past work as a bookkeeper because she retained the residual functional capacity to "perform the full range of sedentary work."[12] (Tr. at 33–34).

---

11. When the Appeals Council declined Woodford's request for an appeal, the ALJ's decision denying her benefits became the Commissioner's final determination on the substantive question of Woodford's entitle-

ment to SSDI benefits. *See* 20 C.F.R. § 404.981.

12. The ALJ only proceeded through four steps in the five step test outlined in 42 U.S.C. § 423(d)(2)(A) because he determined that

Woodford argues that the ALJ did not have sufficient evidence at the administrative hearing to determine that she had sufficient residual functional capacity to engage in sedentary work. (Pl. Mem. at 26). An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities. *See Rivera–Torres v. Sec. of Health & Human Servs.*, 837 F.2d 4, 7 (1st Cir.1988) (collecting cases); *see also* 20 C.F.R. § 404.1512(e) (discussing an ALJ's affirmative duty to develop the administrative record on facts essential to his determination). For the ALJ to make a proper determination about Woodford's residual functional capacity to engage in sedentary work, he was required to review evidence that showed whether she could sit for six hours of an eight hour workday, do a certain amount of walking and standing, and lift up to ten pounds. *See* 20 C.F.R. § 404.1567.

The court's review of the administrative hearing evidence shows that no medical evidence was presented that established whether Woodford could remain seated for six hours. Dr. Kulak's and Dr. Dickson's reports indicated that Woodford had difficulty walking and relied on a cane and air cast. (Tr. at 147–48, 155). Dr. Seo's report indicated that Woodford had difficulty "standing, walking, and carrying heavy objects," and had no difficulty moving from a sitting to a standing position. (Tr. at 136, 138). Additionally, both Dr. Dickson and Dr. Seo reported that Woodford had no difficulty getting off and on the examination table. (Tr. at 136, 155). The ALJ was not permitted to speculate about Woodford's capacity to remain seated based on these medical reports; rather, he had a duty to defer his decision until he procured medical evidence that specifically

discussed Woodford's capacity to remain seated for six hours. *See Murphy*, 872 F.Supp. at 1158.

Indeed, the ALJ compounded his error when he concluded that Woodford could perform sedentary work because she testified that she cooked and shopped for herself, and used public transportation. (Tr. at 36). "Such activities do not by themselves contradict allegations of disability," as people should not be penalized for enduring the pain of their disability in order to care for themselves. *Boyd*, 1999 WL 1129055 at *3 (explaining that a claimant's ability to engage in self-care and other domestic activities does not by itself establish that the claimant is not disabled). The only other evidence supporting the ALJ's determination was Woodford's testimony that she sat through a plane ride to Portugal during her alleged period of disability. (Tr. at 32). However, the mere fact that someone is able to remain seated for a plane ride does not establish that he can sit for six hours on a regular basis. *Cf. LaFace v. Heckler*, 589 F.Supp. 192, 197 (S.D.N.Y.1984) (Sand, J.) (noting that claimant's ability to sit through a seventy-eight minute hearing was not probative of his ability to perform sedentary work).

As the above analysis demonstrates, the ALJ's decision regarding Woodford's capacity to perform sedentary work is not supported by substantial evidence, and remand is required. Also, the supplementary evidence Woodford submitted to the Appeals Council indicates that the ALJ's decision must be reconsidered, as Dr. Kulak's February, 1997 letters directly refute the ALJ's determination that Woodford is capable of remaining seated for six hours. (Tr. at 9–13).

Since the ALJ previously recognized Dr. Kulak as Woodford's treating physician, (Tr. at 64), the Commissioner is required

claimant had not met her burden of proving the first four factors in the inquiry. Only after claimant proves the first four factors, will the ALJ proceed to the fifth factor in the analysis: whether *the Commissioner* can dem- .

onstrate that there are other jobs in the national economy that claimant could pursue despite her disability. *See Whitfield v. Apfel*, 87 F.Supp.2d 196, 200 (E.D.N.Y. 2000) (emphasis added).

on remand to apply the treating physician's rule in reviewing Dr. Kulak's February, 1997 letters. *See Rivera*, 923 F.2d at 968. Specifically, he must afford the February, 1997 letters controlling weight, provided that the information in the letters does not contradict evidence already admitted to the administrative record, and the letters' diagnoses are based on accepted clinical procedures.[13] 20 C.F.R. § 404.1527(d)(2). If the Commissioner determines that the letters should not be afforded controlling weight, he must specifically indicate the weight this evidence is to be given, and the reasons for his decision. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999).

■ Woodford also alleges that the ALJ erred when he found that her subjective pain testimony was overstated and not credible. (Pl. Mem. at 28). A claimant's subjective pain may, when supported by other facts, establish that a claimant has a disability. *See* 20 C.F.R. § 404.1529(a). The claimant's testimony regarding subjective pain must be supported by signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the pain. *Id.*

■ The record indicates that the Commissioner improperly weighed the evidence corroborating claimant's subjective pain testimony. Woodford testified that she felt knife-like pain and numbness in her left ankle after sitting for fifteen to twenty minutes, and pain in her ankle from swelling. (Tr. at 82, 66–67). The

testimony has support in the administrative record, which shows that Woodford repeatedly complained to her doctors about numbness and pain in her left ankle.[14] (*See, e.g.,* Tr. at 145 (complaining of "sleepy feeling" in her ankle); Tr. at 151 (complaining of pain)). The record also shows that Woodford was diagnosed as having degenerative osteoarthritis, a condition which causes pain, and with scarring and calcification of her ankle tendons and ligaments, (Tr. at 142, 145 & 151), a condition which causes loss of sensation and pain. (Tr. at 152–53). Furthermore, the record indicates that Woodford consistently took anti-inflammatory drugs to treat her injuries, and had scaled back her activities because of pain. (*See, e.g.,* Tr. at 80–81, 140, 146, 151). On remand, the Commissioner is required to reconsider Woodford's testimony regarding her subjective pain in light of the evidence highlighted above.[15]

## III. CONCLUSION

The Commissioner's decision denying claimant SSDI benefits is reversed and remanded for reconsideration in accordance with this opinion. This case may be reviewed by the Appeals Council or remanded to an ALJ. *See* 20 C.F.R. § 404.983. Regardless of where the review occurs, the Commissioner is directed to: (1) consider all of claimant's treating doctor's reports when making his determination about claimant's residual functional capacity to perform sedentary work; and (2) to re-examine claimant's subjective pain

**13.** The court's discussion in Section II. A, explaining that the February 1997 letters meet the yardsticks in 20 C.F.R. § 404.970(b), also indicates that the diagnoses in the letters are consistent with Dr. Kulak's prior diagnoses of calcification and scarring at the ankle injury site. Furthermore, the letters use the same clinical approaches used by Dr. Kulak and other consulting doctors whose reports were previously admitted into the administrative record.

**14.** Additionally, Woodford worked consistently for thirty-one years prior to her accident,

(Tr. at 65–78), and therefore her testimony should have been given substantial weight. *See Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir.1983).

**15.** The ALJ's review of the record indicated that Woodford never complained of pain while seated. (Tr. at 36). However, the court's review of the record indicates that Woodford had complained to her doctors about pain while at rest. (*See, e.g.,* Tr. at 144).

testimony in light of the evidence discussed above.

IT IS SO ORDERED.