Vincente GONZALEZ, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 98 CIV. 6514(RLC).

United States District Court,
S.D. New York.

Sept. 5, 2000.

Center for Disability Rights ("Cedar"), Inc., New York, NY, Christopher James Bowes, of Counsel, for Plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York, NY, Susan D. Baird, Assistant United States Attorney, of Counsel, for Defendant.

## OPINION

ROBERT L. CARTER, District Judge.

Vincente Gonzalez ("plaintiff" or "claimant") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) challenging a final determination by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") disability benefits. Both parties move for judgment on the pleadings pursuant to Rule 12(c), F.R. Civ. P.

## BACKGROUND

Plaintiff was born in Puerto Rico in 1943, and attended school there through the third grade. (Tr. at 34, 49.)[1] He can neither read nor write Spanish, and he knows only a little bit of English. (*Id.* at 34, 81.) He moved to the continental United States in 1962. (*Id.* at 32.) He is married, lives with his wife and has three grown children. (*Id.* at 32, 43.) Plaintiff had worked in a factory for many years until around 1976, when he left and began working, sometime thereafter, as a stock clerk and cleaning person in a small grocery store or bodega.[2] (*Id.* at 34, 78, 101.)

---

1. "Tr." refers to the transcript of the administrative record filed by the Commissioner as part of his answer.

2. Plaintiff presented conflicting evidence concerning the length of time he worked in a bodega. In his original application for SSI, dated November, 1994, he stated that he worked as a stock clerk in a grocery store from approximately 1974 or 1975 to August, 1994, (Tr. at 51, 78); in a questionnaire dated December 16, 1994, he stated that he worked as a stock clerk from 1981 to 1994, (*id.* at 101); and during an administrative hearing conducted by the Social Security Administration in 1996, he testified that he worked in a

In early November, 1994, he suffered chest pains and was hospitalized at Bellevue Hospital Center ("Bellevue"). (*Id.* at 115.) Plaintiff's pains were ultimately determined to be non-cardiac in origin, but he did not return to work at the bodega because of unrelated ailments which limited his mobility and strength and caused pain throughout his body, particularly in his legs. (*Id.* at 34–39).

On November 28, 1994, plaintiff applied for SSI benefits with the Social Security Administration ("SSA"), alleging disability due to arthritis, diabetes, a hernia, poor circulation and a heart condition. (*Id.* at 49, 74–76.) His application was denied initially and on reconsideration. (*Id.* at 62, 68.) Plaintiff requested an administrative hearing which was conducted by Administrative Law Judge ("ALJ") Kenneth Levin on September 25, 1996. (*Id.* at 16, 71.) In a written decision dated October 25, 1996, the ALJ denied plaintiff benefits. (*Id.* at 22.) Plaintiff submitted a request to the SSA's Appeals Council for review of the ALJ's decision and for consideration of additional medical evidence. (*Id.* at 11, 233–286.) On May 21, 1998, the Appeals Council rejected the request, making the ALJ's decision the Commissioner's final decision. (*Id.* at 7.) Plaintiff now appeals.

## I. Administrative Hearing

### A. Evidence from Treating Physicians

The ALJ received into evidence medical records and reports submitted by plain-tiff's physicians at Bellevue and The New York Eye and Ear Infirmary.[3] The evidence from Bellevue included two reports, dated January 9, 1995, (*id.* at 91–98), and August 26, 1996, (*id.* at 227–30), submitted by the hospital's Medical Records Physician in response to requests for information from the SSA. The first report indicated that plaintiff had been treated at Bellevue approximately every three months between April, 1989, and November, 1994. (*Id.* at 91.) It noted that plaintiff suffers pain in his left leg and had been diagnosed with non-insulin dependent (type II) diabetes mellitus,[4] degenerative joint disease and hypercholestremia. (*Id.*) It also noted that plaintiff had "recently [been] admitted for chest pain" but that a myocardial infarction, i.e., a heart attack, had been ruled out. (*Id.* at 92.) The report assessed plaintiff as retaining the residual functional capacity to lift and carry no more than ten pounds; stand or walk less than two hours per day; and sit, push and pull without limitation. (*Id.* at 95.)

The second Bellevue report stated that plaintiff had been treated at the hospital approximately every four to six weeks between April, 1989, and August, 1996. (*Id.* at 227.) It noted that plaintiff had a history of diabetic retinopathy,[5] facial weakness[6] and pain in his chest and lower extremities. (*Id.*) It also noted that "[r]e-

---

bodega for five or six years until November, 1994, (*id.* at 34).

**3.** Plaintiff's medical records from The New York Eye and Ear Infirmary concern cataract surgery conducted on his right eye on May 15, 1995. (Tr. at 190–226.) These records are not relevant to plaintiff's appeal.

**4.** Diabetes mellitus is "[a] disorder in which the pancreas produces insufficient or no *insulin*, the hormone responsible for the absorption of glucose into cells for their energy needs and into the liver and fat cells for storage." The American Medical Association, Encyclopedia of Medicine, at 349 (Charles B. Clayman, M.D. ed., Random House 1989)

("AMA Encyclopedia"). Non-insulin dependent (type II) diabetes mellitus refers to a type of diabetes characterized by a body's insufficient production of insulin; in "most cases" a "combination of dietary measures, weight reduction, and oral medication keeps the condition under control." *Id.*

**5.** Diabetic retinopathy is a disease or disorder of the retina caused by diabetes mellitus. *See* AMA Encyclopedia at 867–68.

**6.** In 1989, plaintiff was diagnosed with Bell's Palsy, (Tr. at 122, 227), which is defined as "paralysis of the facial muscles, usually one-sided and temporary." AMA Encyclopedia at 434.

cent x-rays show mild osteoarthritis[7] in [plaintiff's] hips, [and] knees," (*id.*), and diagnosed him with diabetes, diabetic retinopathy and osteoarthritis, (*id.* at 230).

The two reports, prepared on government-provided forms, are accompanied by a complete set of plaintiff's Bellevue medical records. (*Id.* at 113–189, 231.) These records primarily comprise treatment notes and evaluations prepared by various Bellevue physicians between approximately November, 1994, and April, 1996. In particular, they include the notes and diagnoses of a physician in Bellevue's Primary Care Clinic, Dr. Contreras, who had treated plaintiff on at least thirteen occasions during this time period. (*See, e.g., id.* at 136, 139, 164, 167, 172–74, 177–78, 182–83, 187, 189.)

A review of plaintiff's lengthy Bellevue file reveals that he was hospitalized on November 8, 1994, for three days because of substernal chest pain. (*Id.* at 115–132, 134–63.) During that time he was treated by several physicians, including both Drs. Contreras and Colbert. The latter recorded a medical history which recounted that plaintiff had multiple prior Bellevue admissions, a self-reported stroke which occurred around 1988,[8] Bell's Palsy and high cholesterol, among other problems. (*Id.* at 122.) Clinical findings included decreased mobility in plaintiff's left shoulder joint and in both of his knees; decreased pulses in his left leg; and "3–4 block claudication", i.e., lameness, in his left lower extremity. (*Id.* at 116, 122–23, 127–29.) An Emergency Radiology physician, Dr. Brown, reported that x-rays of plaintiff's chest showed "mild peripheral vascular

congestion." (*Id.* at 159.) Ultimately, plaintiff's physicians concluded that his chest pain was non-cardiac in origin, (*id.* at 116, 130), and he was discharged after being diagnosed with atypical chest pain and peripheral vascular disease ("PVD"),[9] (*id.* at 115).

Plaintiff was treated again by Dr. Contreras on November 29, 1994, and was diagnosed with PVD secondary to diabetes and hypertension. (*Id.* at 164.) On February 14, 1995, Dr. Contreras examined plaintiff and reported that plaintiff suffered from PVD and had poor pulses in his lower extremities, which were cold to the touch. (*Id.* at 172.) He noted that plaintiff's diabetes was under control because of his medication but that his claudication was "now so severe that [he is] unable to maintain activities of daily living." (*Id.*) Separately, Dr. Contreras wrote a note that day stating that plaintiff "has severe complications from diabetes causing him severe pain on prolonged ambulation. He is unable to walk for extended distance[s]." (*Id.* at 231.) Dr. Contreras also saw plaintiff on February 23, 1995, and requested a vascular surgery consultation because plaintiff's "claudication [was] unrelieved" by various medications. (*Id.* at 173.)

On April 27, 1995, the physician who provided the vascular consult suggested that plaintiff's leg pain was not likely secondary to claudication because plaintiff had good distal pulses; it was rather "most likely" due to osteoarthritis. (*Id.* at 175.) Two weeks later, an orthopedic physician's report indicated that plaintiff had increased leg pain upon ambulation and reported being unable to work in a grocery

---

7. Osteoarthritis is a type of arthritis also known as degenerative arthritis. *See* AMA Encyclopedia at 132. It is defined as a "joint disease aggravated by mechanical stress.... [and it] is characterized by degeneration of the cartilage that lines joints or by *osteophyte* (bony outgrowth) formation, which leads to pain, stiffness, and occasionally loss of function of the affected joint." *Id.* at 753.

8. Dr. Colbert specifically wrote: "CVA (can't remember how long ago) 1988". (Tr. at 122.)

CVA presumably stands for cerebrovascular accident, a "[s]udden rupture or blockage of a blood vessel within the brain" which leads to "neurologic features commonly called *stroke*." AMA Encyclopedia at 249.

9. Peripheral vascular disease is a "[n]arrowing of blood vessels in the legs, and sometimes in the arms, restricting blood flow and causing pain in the affected area." AMA Encyclopedia at 784.

store due to the pain. (*Id.* at 176.) On September 19, 1995, Dr. Contreras again examined plaintiff and diagnosed diabetes, PVD, high cholesterol and osteoarthritis in plaintiff's left knee. (*Id.* at 178.) On September 25, 1995, Dr. Golimbu, a radiologist at Bellevue, took impressions of plaintiff's knees and pelvis and found that while there was "[m]inimal degenerative change" in his left and right hip, the "right hip joint space is minimally narrowed superiorly, suggesting osteoarthritis." (*Id.* at 181.) She also confirmed that plaintiff had a metallic foreign object in the middle of his left thigh. (*Id.*) Finally, on December 12, 1995, and April 23, 1996, Dr. Contreras examined plaintiff and reiterated his earlier diagnoses of diabetes, claudication and PVD; he also added his suspicion that plaintiff might be suffering from peripheral neuropathy. (*Id.* at 187, 189.)

B. Evidence from Consulting Physicians

The ALJ considered evidence from two consultative physicians who examined plaintiff on the Commissioner's behalf: Dr. De Leon, who examined plaintiff on February 10, 1995, and Dr. Brook, a radiologist who took and interpreted an x-ray of plaintiff's chest. (*Id.* at 105, 108.) During Dr. De Leon's examination, plaintiff reported a history of hypertension, diabetes, a heart condition, daily chest pains, and arthritis in his shoulder, neck, back, hands, feet and knees. (*Id.* at 105.) He specifically denied ever having had a heart attack. (*Id.*) Dr. De Leon examined plaintiff's extremities and reported no leg edema, i.e., accumulated fluid in the leg tissues. (*Id.* at 106.) His assessment of plaintiff's musculoskeletal system noted that plaintiff mounted the examination table slowly; an examination of plaintiff's neck, shoulder, elbow and wrist joints was negative; plaintiff was fully able to grip and could perform both fine and gross manipulations; plaintiff had no back tenderness; and an examination of plaintiff's hips, knees and ankles was negative—there was no joint swelling or effusion, no tenderness and no

limitation of motion. (*Id.* at 106–107.) Plaintiff's chest x-ray was also negative. (*Id.* at 108.) Dr. De Leon diagnosed plaintiff with controlled hypertension, diabetes, arthralgia [10] and atypical chest pains, among other things, and stated that his prognosis was fair. (*Id.* at 107.) He opined that plaintiff was "able to perform the following work related activities, sitting, no limitation, walking, standing, carrying, lifting, pushing, [and] pulling slightly limited because of arthralgia and chest pains." (*Id.*)

The ALJ also considered the assessments of plaintiff made by two non-examining state agency physicians, Drs. Danza and Reynolds. (*Id.* at 54–65, 68.) These two physicians reviewed the January 1995 Bellevue report, as well as Dr. De Leon's report, and opined that plaintiff had the residual functional capacity to occasionally lift and carry up to 20 pounds; frequently lift and carry up to ten pounds; stand, walk and sit six hours per day; and push or pull without limitation. (*Id.* at 55.) They also stated their belief that the residual functional capacity assessment made by the Bellevue physician in the January 1995 report was not supported by any objective medical evidence, but they failed to elaborate why. (*Id.* at 60.)

C. Testimony

Plaintiff appeared at the administrative hearing pro se and testified with the help of a Spanish-language interpreter. (*Id.* at 16.) He testified generally about his background, *see* supra pp. 581–582, and stated that he last worked in a bodega, stocking and cleaning shelves, for a period of about five or six years, (*id.* at 34). He indicated that he stopped working after being hospitalized for chest pain in November, 1994, which at the time he thought was caused by thrombosis or stroke but which he had since learned "was not a heart problem." (*Id.*) Nonetheless, he explained that he did not return to work because of pain in his feet, bones, back, shoulders and legs which

10. Arthralgia is "a term meaning pain in the joints." AMA Encyclopedia at 131.

made it difficult for him to walk. (*Id.* at 36.) He also complained about various other ailments including stomach ulcers, dizziness, blurred vision and a testicular hernia. (*Id.*)

The second and last witness to testify was Dr. Plotz, an internist who appeared as a medical expert at the ALJ's behest. (*Id.* at 45.) Dr. Plotz never examined plaintiff; his testimony was based merely on his review of plaintiff's medical records and his observation of plaintiff during the hearing. Dr. Plotz agreed with the treating physicians' diagnosis of diabetes, but opined that, despite plaintiff's complaints of arthritic pains, plaintiff "d[id] not have objective arthritis." (*Id.*) He found that plaintiff once had Bell's Palsy but, based on his physical appearance at the hearing, he seemed to have completely recovered. (*Id.*) He also indicated that plaintiff had a successful cataract operation; had chest pain which was "not typically anginal", (*id.*); and had an elevated eosinophil (a type of white blood cell) count which was of "no medical consequence", (*id.* at 45–46). Dr. Plotz concluded:

> There is really nothing in the medical record to account for the rather extensive complaining that [plaintiff] has done today at this hearing. Certainly nothing involving his thyroid, which he mentioned, or similar condition. There is nothing to suggest that he has any significant peripheral neuropathy as a result of his diabetes mellitus.... On the basis of the medical record as presented ... he should be able to do light work as defined.

(*Id.* at 46.) However, in an apparent attempt to resolve the contradiction between his opinion that there was no objective medical evidence to account for plaintiff's alleged pains but that nonetheless plaintiff should be limited to light work, Dr. Plotz added:

> [Plaintiff] complains of rheumatic pains. And my feeling as a physician is that if you ask him to do more than light work as defined, he would, he would complain

more. And, and just get achier and, and ... stop altogether.... He might have [then a medical basis for his pains]. I, you know, there's, there's nothing—he has had no extensive workup for arthritis. So, it's just hard for me to say.

(*Id.* at 47.)

## II.  Appeals Council

Plaintiff submitted additional evidence to the Appeals Council, including a letter repeating his initial claim that his prior job duties "involved lifting and carrying boxes of about 100 pounds." (*Id.* at 233.) He added that at the end of his employment he "could barely force [himself] to lift 10 pounds." (*Id.*)

Plaintiff also submitted a September 26, 1996, report prepared by Dr. Davis, his pulmonary specialist. Dr. Davis, who had treated plaintiff between April, 1989, and August, 1996, diagnosed him with diabetes, diabetic retinopathy, high cholesterol, osteoarthritis, mild PVD and borderline hypertension. (*Id.* at 251.) Her clinical findings included a generally normal physical examination on August 14, 1996; decreased pulses in plaintiff's lower extremities; an elevated glucose level; a negative chest x-ray except for mild peripheral vascular congestion; and x-rays of his hip, knees and right shoulder showing mild changes consistent with osteoarthritis. (*Id.*)

Dr. Davis admitted that plaintiff's "pain seem[ed] out of proportion to objective findings." (*Id.*) Nonetheless, she concluded that plaintiff could sit for only 30 minutes continuously and two to four hours daily; stand for only 20 minutes continuously and one hour daily; and walk only two to three blocks continuously and 30 minutes daily. (*Id.* at 252–53.) She assessed plaintiff as being able to occasionally lift and carry between six and ten pounds; occasionally bend, squat and reach; and never climb. (*Id.* at 253–54.) She added that plaintiff could not use his hands, legs or feet for any repetitive actions such as simple grasping, fine manip-

ulation or pushing and pulling. (*Id.*) Finally, she indicated that plaintiff had moderate restrictions in the following categories: exposure to marked changes in temperature and humidity; exposure to dust, fumes and gases; and stress. (*Id.* at 254.)

Lastly, plaintiff submitted medical evaluation forms prepared by Drs. Contreras and Han following an August 14, 1996, examination. (*Id.* at 235, 237.) These forms indicated that plaintiff's extremities were warm with good peripheral pulses; his x-rays showed mild osteoarthritis in his back, shoulders and knees; his pain distribution was inconsistent with diabetic neuropathy; he suffered diabetes; and he should engage in non-weight bearing exercise and consider physical therapy.[11] (*Id.*)

## DISCUSSION

"Judicial review of the Commissioner's denial of benefits is strictly limited." *Richardson v. Apfel,* 44 F.Supp.2d 556, 560 (S.D.N.Y.1999) (Carter, J.). The court may not determine de novo whether a claimant is disabled; rather, it may only set aside the Commissioner's decision if it is based on legal error or is not supported by substantial evidence in the record as a whole. *See Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks and citation omitted)).

The SSA has promulgated a five-step procedure for evaluating disability claims. 20 C.F.R. § 416.920. Utilizing this procedure, the ALJ concluded that: 1) claimant had not engaged in substantial gainful activity since November 28, 1994; 2) claimant's impairment was severe; 3) claimant's impairment did not meet or equal the level of severity of any impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1; and 4) claimant was ineligible for benefits because he retained the residual functional capacity to perform light work and, since his past work required only light levels of exertion, he could return to his former job as a grocery store clerk.[12] (Tr. at 21–22.)

### I. Past Work

■■■■ Plaintiff argues that the ALJ failed to afford him a full hearing on the issue of whether his past work was light work. In determining whether a decision by the Commissioner is based on substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (internal quotation marks and citations omitted). In order to provide a full hearing, an "ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Tejada v. Apfel,* 167 F.3d 770, 774 (2d Cir.1999) (internal quotation marks and citations omitted). When a claimant appears pro se, an ALJ has a heightened duty to assist the claimant in

---

**11.** Plaintiff also submitted medical files from Bellevue which post-date the ALJ's decision. The court disregards these files because they do not relate to the claimant's condition prior to the ALJ's decision. *See* 20 C.F.R. § 416.1470(b) (stating the Appeals Council will only consider new and material evidence "where it relates to the period on or before the date of the administrative law judge hearing decision.").

**12.** Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting

or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 416.967(b).

developing his case and to " 'ensur[e] that all of the relevant facts [are] sufficiently developed and considered.' " *Cruz,* 912 F.2d at 11 (quoting *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980)). Indeed, the Second Circuit has specifically decreed that when a "claimant is handicapped by lack of counsel, ill health, and inability to speak English .... the ALJ has a duty ... to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Donato v. Secretary of the Dep't of Health and Human Servs.,* 721 F.2d 414, 418 (2d Cir.1983) (internal quotation marks and citations omitted).

On review of the evidence concerning the nature of plaintiff's past work as a stock clerk, it is clear that the ALJ failed to properly develop the record. Plaintiff presented conflicting evidence about his past work. In a report submitted with his initial application for disability benefits, he characterized his job duties as: "Keep[ing] shelves stocked with groceries. Sort[ing] deposit bottles. Mov[ing] groceries around in storage areas." (Tr. at 78.) He described the physical exertion typically required of him as eight hours of walking and standing, zero to one hour of sitting, and constant bending and reaching. (*Id.* at 79.) He reported that he was required to lift and carry cases of canned goods from the bodega's basement to its front shelves, a distance of 100 feet. (*Id.*) The heaviest weight he lifted was 100 pounds; he frequently carried items weighing up to 50 pounds. (*Id.*)

In contrast, during the administrative hearing held almost two years later, plaintiff briefly testified that he "did not do lift or [sic] any supplies, only maybe boxes up to 10 pounds." (*Id.* at 35.) He characterized his duties as merely "clean[ing] off the shelves, and just, you know, drawers, and you know, stuff." (*Id.*) When the ALJ queried "So, it was kind of light, light level work then?", plaintiff responded "Yes." (*Id.*)

The ALJ concluded, based on plaintiff's testimony alone, that his past work was light work. (*Id.* at 21.) However, in accordance with his heightened duty in this case, the ALJ was obligated, when confronted with plaintiff's "unexpected" testimony, (*id.* at 16), to remind plaintiff about his initial statements and to solicit greater details about his past work in an effort to disambiguate the evidence, *see Mann v. Chater,* 1997 WL 363592, at *4 (S.D.N.Y. June 30, 1997) (Sotomayor, J.) ("Although an ALJ need not resolve every inconsistency and ambiguity in the record, he ... must still, especially where an unrepresented claimant is involved, affirmatively assist the claimant in developing the record." (citations omitted)). Instead, the ALJ erred by cutting short his inquiry after asking only two or three general questions and then guilefully eliciting plaintiff's agreement that his past work merely entailed "kind of a light, light level work." (Tr. at 35.) Plaintiff had no inkling of the meaning of the term "light work" and of the legal significance of his response to the ALJ's leading question; his testimony on this point has absolutely no probative value.

Rather than abruptly ending his inquiry here, the ALJ should have proceeded to ask plaintiff why his testimony differed from his earlier statements. He should have also posed a thorough set of follow-up questions concerning the exertional demands of plaintiff's past job in an effort to scrupulously search for all of the relevant facts. As the Second Circuit stated in *Donato,* in language suitable to this case:

> [B]efore deciding whether [claimant] was physically capable of resuming her factory work, the ALJ, in fulfillment of his "heightened duty" to explore for all relevant facts, should have inquired further into the nature and extent of the physical exertion required of her by her former job, the number of hours she worked each day, the length of time she stood for any one period, the distance she would be required to walk in commuting to work, and the like.

*Donato,* 721 F.2d at 419 (internal citation omitted). *See also Kerulo v. Apfel,* 1999 WL 813350, at \*8 (S.D.N.Y. Oct.7, 1999) (Mukasey, J.) ("[I]n order to determine at step four whether a claimant is able to perform her past work, the ALJ must make a specific and substantial inquiry into the relevant physical and mental demands associated with the claimant's past work."). The ALJ's superficial and truncated inquiry into the nature of plaintiff's past work failed to discharge his duty to assist plaintiff and conduct a full hearing.[13]

For the aforementioned reasons, the Commissioner's finding that plaintiff's past work was light work is set aside.

## II. Treating Physician Rule

■ Plaintiff argues that the ALJ gave insufficient weight to the opinions of his treating physicians in determining that he is capable of performing light level work. According to the "treating physician rule", the medical opinions of a claimant's treating sources are given "special evidentiary weight" in disability benefits cases. *Clark v. Commissioner of Social Security,* 143 F.3d 115, 118 (2d Cir.1998). The SSA regulations specifically state:

> Generally, we give more weight to opinions from your treating sources.... If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). If such an opinion is not given controlling weight, the Commissioner applies the following factors in deciding how much weight to assign it: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark,* 143 F.3d at 118 (citing 20 C.F.R. § 416.927(d)(2)). These factors are also applied in assessing the weight to be given the opinions of other medical sources. *See* 20 C.F.R. § 416.927(d), (f).

As an initial matter, the court notes that the ALJ's decision wrongfully disregarded Dr. Contreras's opinion that plaintiff was "unable to walk for extended distances." (Tr. at 231.) The ALJ rejected Dr. Contreras's opinion, expressed in a letter dated February 14, 1995, on the ground that the text of the letter "greatly limits claimant's ability to stand and walk because of 'severe' *peripheral neuropathy* .... [and] there is simply no showing that claimant in fact has peripheral neuropathy." (*Id.* at 20) (emphasis added). The letter actually states that plaintiff's walking is limited because of "severe complications from *diabetes* causing him severe pain on prolonged ambulation." (*Id.* at 231) (emphasis added).

■ Since Dr. Contreras is properly regarded as one of plaintiff's treating physicians, the ALJ erred by not assigning his opinion controlling or at least greater weight. No one disputes either Dr. Contreras's diagnosis of diabetes or the assertion that plaintiff is at least somewhat limited in his ability to walk, and perform other activities, because of diabetes and/or arthritis. (*Id.* at 46–47, 107.) The only relevant dispute between the various physicians as to plaintiff's physical capabilities arises over the extent of plaintiff's limitations: Dr. Contreras believes that plaintiff's ability to walk is greatly limited; Dr. De Leon believes that it is only "slightly limited", (*id.* at 107); and Dr. Plotz believes that plaintiff is able to perform light work, which requires "standing or walking, off and on, for a total of approximately 6 hours of an 8–hour work day," *Johnson v.*

---

**13.** The insufficiency of the ALJ's foreshortened inquiry is also illustrated by his decision to dispense with the anticipated testimony of a vocational expert. (Tr. at 16) ("Vocational expert William Mooney was present but, in view of claimant's unexpected testimony about his previous work, was not asked to testify.").

*Apfel*, 1998 WL 372406, at *5 (E.D.N.Y. 1998) (citations and internal quotations omitted). Nonetheless, Dr. Contreras's opinion is entitled to the greatest weight because he routinely observed and treated plaintiff during at least a two-year period and made more extensive clinical findings and medical diagnoses than any other physician. *See Shaw v. Chater*, 221 F.3d 126, 2000 WL 992012, at *7 (2d Cir. July 20, 2000) (holding ALJ should have given controlling or at least greater weight to opinion of physician who had treated plaintiff for seven years, "made medical observations far more extensive than those of any other consulting physician", and where there was "no indication that [his] observations were unsupported by medical evidence"); *Cruz*, 912 F.2d at 12 ("[T]he opinion of a treating physician on the subject of medical disability is (1) binding on the fact-finder unless contradicted by substantial evidence and (2) entitled to some extra weight, even if contradicted by substantial evidence, because the treating source is inherently more familiar with a claimant's medical condition." (internal quotations and citation omitted)).

In contrast, Dr. De Leon's opinion, which is based solely on a single examination of plaintiff, deserves limited weight. *See Crespo v. Apfel*, 1999 WL 144483, at *7 (S.D.N.Y. Mar.17, 1999) (Cedarbaum, J.) ("In making a substantial evidence evaluation, a consulting physician's opinions or report should be given limited weight" because "they are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day." (citations omitted)). The opinions expressed by Dr. Plotz and the state

agency medical consultants, as those of nonexamining sources, are entitled to even less weight than Dr. De Leon's. *See* 20 C.F.R. § 416.927(d)(1) (directing that a non-examining source's opinion, including the opinions of state agency medical consultants and medical experts, be given less weight than an examining source's opinion).

■ The ALJ also erred by basing his decision primarily on Dr. Plotz's testimony. Dr. Plotz's opinion, aside from deserving little weight for the aforementioned reason, is conclusory, inherently contradictory and based on careless factual errors. To begin with, his overly broad assertion that there is "nothing in the medical record" to support plaintiff's complaints of pain is clearly contradicted by the ample and irrefuted evidence that plaintiff suffers from diabetes, PVD and osteoarthritis and has been hospitalized for chest pains. (Tr. at 46.) It is also contradicted by his own conclusion that plaintiff should be limited to light work because of rheumatic pains. Furthermore, although Dr. Plotz asserts that plaintiff "does not have objective arthritis", there is an overabundance of evidence which he had to ignore in drawing this conclusion: e.g., the multiple examinations and repeated diagnoses of plaintiff's treating physicians; the ample clinical evidence, including x-rays; and even the results of Dr. De Leon's examination. (*Id.* at 45.) Dr. Plotz further undermines the value of his medical opinion when he finally admits, at the end of his testimony, that since he only has limited information concerning plaintiff's arthritis "it's just hard for me to say."[14] (*Id.*)

14. Dr. Plotz also made a number of mistakes in his testimony. He misstated, for example, that plaintiff complained of a thyroid problem,—and he pointed out that there was no evidence of such a problem in plaintiff's record—when plaintiff had actually testified that his wife had a thyroid problem. (Tr. at 46.) He also misstated that plaintiff did not have a stroke in 1989, when plaintiff's medical records indicated that plaintiff suffered a stroke around 1988. (*Id.* at 122.)

Moreover, the ALJ's assignment of greater weight to Dr. Plotz's opinion because, as the ALJ stated, "I know Dr. Plotz to be an extremely thorough and well-informed physician who takes his responsibility to know the record and make judgments therefrom very seriously, whereas I know nothing about the Bellevue records reviewer at all", is categorically impermissible. (*Id.* at 20.) Nowhere do the regulations allow the ALJ to consider his

■ Finally, the ALJ's decision that plaintiff can perform light work is not based on substantial evidence because it repeatedly relies upon the ALJ's substitution of his own judgment for "competent medical opinion." *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998). For example, the ALJ improperly discounted the second Bellevue report's diagnosis of osteoarthritis because plaintiff's x-rays showed only "minimal" osteoarthritis, (Tr. at 20), and he discounted the severity of plaintiff's diabetes because plaintiff had successfully maintained "his regular weight", (*id.* at 21).[15] *See Filocomo v. Chater,* 944 F.Supp. 165, 170 (E.D.N.Y.1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings."). In addition, the ALJ's assessment of how much pain plaintiff experienced during the hearing, which he discussed at length in his decision, is entitled to much less weight than he assigned it.[16] *See Kerulo v. Apfel,* 1999 WL 813350, at *4 (S.D.N.Y. Oct.7, 1999) (Mukasey, J.) (" 'An ALJ's observation that [a claimant] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight.' ") (quoting *Carroll v. Secretary of*

*Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983)).

In addition to the ALJ's errors, the Appeals Council erred in denying plaintiff's request for reconsideration, particularly given the new and material evidence contained in Dr. Davis's report.[17] Dr. Davis's opinion, being that of a specialist who treated plaintiff during a seven-year period, and her diagnoses of diabetes, osteoarthritis and mild PVD, which are consistent with substantial evidence in the record, deserve controlling weight. Her assessment that plaintiff could walk for only 30 minutes, stand for one hour, sit for four hours, and occasionally lift and carry up to ten pounds is dispositive, therefore, on the issue of plaintiff's residual functional capacity. It compels the conclusion that plaintiff is incapable of performing light work.

For the aforementioned reasons, the Commissioner's decision that plaintiff retains the residual functional capacity to perform light work is reversed.

### III. Relief

■ "[A] remand for further proceedings is the appropriate remedy when an erroneous step four determination has precluded any analysis under step five."

---

personal knowledge of and relationship with a medical source in evaluating the evidence.

**15.** The court takes judicial notice of the fact that weight loss can be a symptom of diabetes. *See* AMA Encyclopedia at 349.

**16.** The court also notes sua sponte that the ALJ failed to properly weigh plaintiff's complaints of subjective pain. Although an " 'ALJ has discretion to evaluate the credibility of [a] claimant and to arrive at an independent judgment ... regarding the true extent of the pain alleged,' " he must cite "legitimate reasons" for disbelieving a claimant's testimony about his pain. *Lugo v. Apfel,* 20 F.Supp.2d 662, 662 (S.D.N.Y.1998) (Rakoff, J.) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987) (Leisure, J.)). There is evidence in this case that the ALJ failed to seriously consider many of plaintiff's complaints of pain, preferring instead to dismiss them out of hand. For example, when plaintiff testified that his arthritic pains worsened in

the winter and indeed made him "tremble", the ALJ condescendingly inquired:

Q: You tremble when you walk in the street. What do you mean?
A: Because of the cold.
Q: Well, would you tremble walking in the street if you had a warm coat on?
(Tr. at 39.)

**17.** The court may consider Dr. Davis's opinion on appeal. It is well-settled that "new evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996). Dr. Davis's report was properly considered by the Appeals Council because it was "new, material evidence regarding [claimant's] condition prior to the ALJ's decision." *Woodford v. Apfel,* 93 F.Supp.2d 521, 526 (S.D.N.Y.2000) (Carter, J.).

*Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir.1999). However, there is authority in this circuit for allowing a direct award of benefits when the record in a case provides "persuasive evidence of total disability that render[s] any further proceedings pointless." *Id.* (citing *Rivera v. Sullivan,* 923 F.2d 964, 970 (2d Cir.1991) ("[T]he record fails to reveal any evidence which could support a finding that Rivera was capable of performing substantial gainful work which was available in the national economy."); *Vargas v. Sullivan,* 898 F.2d 293, 296 (2d Cir.1990) (awarding benefits where there is an "infinitesimal likelihood" of employment); *Arroyo v. Callahan,* 973 F.Supp. 397, 400 (S.D.N.Y.1997) (Sweet, J.) ("[T]he record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." (internal quotations and citation omitted))).

Dr. Davis's opinion mandates a finding not only that plaintiff is unable to perform light work, but that he is also unable to perform sedentary work. Even though Dr. Davis opined that plaintiff was capable of lifting up to ten pounds, she found that he could stand and walk for no more than one and one-half hours, and sit for only four hours, daily. Sedentary work requires not only that a claimant be able to lift up to 10 pounds at a time, but that he stand and walk up to two hours, and sit approximately six hours, during an eight-hour work day. *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir.2000). Since plaintiff cannot perform even sedentary work, the least strenuous classification of jobs in the national economy considered by the Commissioner at step five, *see id.,* a remand for further proceedings is pointless.

Even if plaintiff retained the residual functional capacity to perform sedentary work, the SSA's Medical–Vocational Guide-

lines, 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 200.00 et seq., would automatically direct a finding that he is disabled from performing any substantial gainful work available in the national economy. Pursuant to subsections 201.00(d)-(f) and 201.01, which pertain to individuals limited to sedentary work, plaintiff's advanced age, illiteracy (i.e., limited or less education), and lack of transferrable skills mandate a finding of total disability.[18]

### CONCLUSION

The Commissioner's decision denying plaintiff SSI disability benefits is reversed and remanded for the calculation of benefits only.[19] The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

---

**18.** Moreover, the Medical–Vocational Guidelines would similarly direct a finding of total disability even if plaintiff retained the residual functional capacity to sustain light work. *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 202.01.

**19.** This disposition is particularly appropriate given that plaintiff's application has been pending for almost six years. *See Curry v. Apfel,* 209 F.3d 117, 124 (2d Cir.2000).