Shazia **SHEERINZADA**, Plaintiff,

v.

Carolyn W. **COLVIN**, as Commissioner of Social Security, Defendant.

No. 12–CV–4751 (ADS).

United States District Court, E.D. New York.

Signed March 10, 2014.

Law Office of Sharmine Persaud by: Sharmine Persaud, Esq., of Counsel, Farmingdale, NY, for Plaintiff.

United States Attorney's Office, EDNY by: Robert W. Schumacher, II, Assistant United States Attorney, Central Islip, NY, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On September 24, 2012, the Plaintiff Shazia Sheerinzada (the "Plaintiff") commenced this action pursuant to the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging a final determination by Carolyn W. Colvin, the Commissioner of Social Security ("the Commissioner"), that she was ineligible for Social Security disability benefits. Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(c). Also before the Court is the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons set forth below, the

Commissioner's motion for judgment on the pleadings is denied and the Plaintiff's cross-motion for judgment on the pleadings is granted, but only to the extent that he Court finds that remand is appropriate in this case.

## I. BACKGROUND

### A. Procedural History

On October 16, 2008, the Plaintiff filed an application for Social Security disability benefits, alleging a disability and inability to work since August 6, 2007. (Administrative Record ("AR") at 88–93.) In this regard, the Plaintiff claimed disability due to pain caused by a "pelvis that showed widening of the symphysis pubis" after giving birth. (AR at 168.) On March 3, 2009, the Social Security Administration ("SSA") denied the Plaintiff's application. In the March 3, 2009 Notice of Disapproved Claim, the SSA advised the Plaintiff that she had the right to request a hearing and offered the following guidance:

**If You Want Help with Your Appeal**

You can have a friend, lawyer, or someone else help you. There are groups that help you find a lawyer or give you free legal services if you qualify. There are also other lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

(AR at 52–53.)

On March 20, 2009, the Plaintiff requested a hearing by an Administrative Law Judge. (AR at 57.) By letter dated April 27, 2009, the SSA notified the Plaintiff that it received her request for a hearing and would inform her at least twenty days before the hearing as to when and where it would be held. The SSA also advised the Plaintiff of her right to representation, as follows:

**Your Right to Representation**

You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing. IF you decide to have a representative, you should find one immediately so that he or she can start preparing your case.

Some private lawyers charge a fee only if you receive benefits. Some organizations may be able to represent you free of charge. Your representative may not charge or receive any fee unless we approve it.

(AR at 59.) The SSA also included a leaflet entitled "Social Security and Your Right to Representation," as well as a list of groups that could help the Plaintiff find representation. (AR at 59, 61–65.)

By letter dated July 8, 2010, the SSA notified the Plaintiff that her hearing was scheduled for August 9, 2010. (AR at 72.) Once more, the SSA advised the Plaintiff that she may choose to have person represent her and that "[i]f she want[ed] to have a representative," she should "find one right away." (AR at 73.) In addition, with the July 8, 2010 letter, the SSA again provided the Plaintiff with "Social Security and Your right to Representation" leaflet. (AR at 78–80.)

On August 9, 2010, a hearing was held before Administrative Law Judge Seymour Fier (the "ALJ"). (AR at 29.) During the hearing, the Plaintiff appeared without counsel and only the Plaintiff and a medical expert, Dr. Bernard D. Gustoff, MD ("Dr. Gustoff"), testified. At the start of the hearing, the ALJ stated that "[t]he record should also indicate that the [Plaintiff] was advised at all times by the Social Security Administration of her right to have representation. The fact that she

appears here without the representation indicates that she wishes to go ahead with the hearing today." (AR at 31.) The Plaintiff confirmed that this was correct. (AR at 31.)

Following the hearing and a review of the evidence, in a decision dated September 21, 2010, the ALJ determined that the Plaintiff was not disabled within the meaning of §§ 216(i) and 223(d) of the Social Security Act. As such, the ALJ denied her claim for disability insurance benefits. (AR at 20–25.)

The Plaintiff sought review of the ALJ's decision by the Appeals Council and submitted additional evidence. (AR at 1, 6.) In a notice dated August 21, 2012, the Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's September 21, 2010 decision the final decision of the Commissioner in the Plaintiff's case. (AR at 1–7.) The Plaintiff then commenced the present appeal from that decision.

### B. The Administrative Record

#### 1. The Plaintiff's Non–Medical Background

The Plaintiff was born in Afghanistan on May 3, 1970. (AR at 32.) In 1984 she came to the United States, and in 1989 she became an American citizen. (AR at 32.) She was thirty-seven years old at the onset date of her injury, and forty years old at the time of the ALJ's decision. (AR at 32.)

The Plaintiff has a bachelor's degree in accounting and prior work experience as an accountant. (AR at 32.) As an accountant, the Plaintiff needed "residual functional capacity for sedentary work." (AR at 25.) In or about April of 2007, the Plaintiff stopped working because she was seven-months pregnant. (AR at 33.) At that time, she and her husband moved from California to New York. (AR at 33.) The Plaintiff, her husband and their two children, ages three and fifteen months, presently live on the second floor of a private house. (AR at 34, 37.)

The Plaintiff's daily activities include cooking and resting. (AR at 39.) Further, she regularly plays with and takes care of her children, generally with the help of her sister, who spends a great deal of time caring for the Plaintiff's children and assisting with other chores. (AR at 37, 39.) Other extended family members also help with taking care of the Plaintiff's children and with chores. (AR at 37, 39.) In this regard, her family members routinely come to her house as well to help out with her two children. (AR at 37.) In addition, three to four times a week, the Plaintiff drives approximately ten to fifteen minutes to family members' houses; the store; and doctors' appointments. (AR at 40.)

#### 2. The Medical Evidence

The basis for the Plaintiff's claim for disability insurance benefits is that she suffered a separated pelvis sustained during childbirth on August 6, 2007. (AR at 88–93, 102.) In this regard, on August 6, 2007, the Plaintiff was admitted to New York Hospital Queens for the birth of her first child, who was 8.5 pounds upon delivery. (AR at 167, 168, 222, 238, 363.) After giving birth, the Plaintiff allegedly complained of extreme pain in her pelvis and back. (AR at 168, 238, 363, 367.) An x-ray and computed tomography ("CT") revealed that the Plaintiff had experienced a widening of her pubic symphysis by about five centimeters. (AR at 168, 170–172, 236–242, 367–383.) In a progress report, the Plaintiff's attending obstetrician, Dr. Angela Todd, MD ("Dr. Todd"), observed that that the Plaintiff's "pelvis [did] not appear unstable" but that the "degree

of anterior widening [was] concerning." (AR at 155, 168, 238, 363.) Dr. Todd advised the Plaintiff to use a pelvic binder, undergo further testing and possibly start physical therapy. (AR at 168–69.)

One month later, on September 4, 2007, the Plaintiff was assessed by Dr. Philip D'Ambrosio, MD ("Dr. D'Ambrosio"), an orthopedic surgeon. (AR at 229, 385.) According to his consultation notes, based on x-rays of the Plaintiff's pelvis, Dr. D'Ambrosio found that the Plaintiff had a pubic diastasis of 2.5 centimeters. (AR at 229, 385.) "Because of [the Plaintiff's] continued pain," Dr. D'Ambrosio referred her to his associate, Dr. Ronald Light, MD ("Dr. Light"), who was also an orthopedic surgeon. (AR at 229, 313, 385.)

On September 7, 2007, Dr. Light examined the Plaintiff. (AR at 230, 386.) In his follow-up notes, he wrote that he observed that the Plaintiff had "residual tenderness in the pubic symphysis." (AR at 230, 386.) In addition, he stated that the Plaintiff had no increased pain "with attempted pubic rock or compression." (AR at 230, 386.) Dr. Light advised the Plaintiff to continue using the pelvic binder and to return for a reassessment within three to four weeks. (AR at 230, 386.)

The Plaintiff again visited Dr. Light on October 2, 2007. (AR at 231.) At the time, she was still using a walker. (AR at 231.) Dr. Light diagnosed the Plaintiff as having a "functional range of motion of the hips with some residual muscle spasm." (AR at 231.) However, he also noted that there was no increased pain with the "extraction of the pelvic wings," and that "[x]rays [did] not reveal any significant change at the diastasis at approximately 3 [centimeters]." (AR at 231.) Dr. Light requested that the Plaintiff be reassessed within three to four weeks so that he could monitor her progress. (AR at 231.)

On November 12, 2007, the Plaintiff visited another orthopedic surgeon, Dr. David L. Helfet, MD ("Dr. Helfet"). (AR at 185.) She informed him that the difficulty she experienced with walking following the injury had improved, but that she still needed to use a walker. In his notes, Dr. Helfet stated that he observed that the Plaintiff's "pain [was] well controlled [ ] and she [did] not require medications other than the occasional Motrin." (AR at 185.) He evaluated the Plaintiff as having a "slightly paddling slow guarded gait"; having "no motion of the pelvis with compression or distraction of the crest"; being "neurovascularly intact distally"; and having minimal localized anterior tenderness. (AR at 185.) In addition, Dr. Helfet noted that radiographs showed a 1.9 centimeter widening of the pubis symphysis. (AR at 185.)

Dr. Helfet concluded that "given the decrease in the diastasis and [the Plaintiff's] clinical improvement[,] non[-]operative treatment [was] warranted at [that] point." (AR at 185.) However, he recommended that "if the [Plaintiff] remain[ed] chronically symptomatic or [had] recurrence[,] . . . intervention with ORIF" would be considered. (AR at 185.) Further, he started the Plaintiff on a PT regiment in order to improve her gait training and advised a reassessment in six weeks. (AR at 185.)

On January 16, 2007, the Plaintiff returned to see Dr. Light for a reassessment of her pelvis. (AR at 388.) According to Dr. Light, the Plaintiff still had a slight discomfort in the pubis symphysis, but was able to perform routine activities with more comfort. (AR at 388.) Xrays revealed slightly smaller diastasis of the pubis symphysis as compared to earlier films. (AR. at 388.) Dr. Light advised the Plaintiff that her condition might continue to improve slowly and that she should gradu-

ally increase her activity level. (AR at 388.)

On March 14, 2008 the plaintiff returned to Dr. Light for yet another assessment of her injury. (AR at 232, 389.) Dr. Light reported that the Plaintiff continued to have "pain and discomfort to the pelvic region as well as to the lower back along the mid lumbar spine and sacroiliac joints." (AR at 232, 389). He also observed that she was still unable to perform daily activities, nor resume sexual relations with her husband, due to her pain and discomfort. (AR at 232, 389.) In addition, he found that pelvic x-rays of the Plaintiff demonstrated similar diastasis to the public pubic symphysis when compared to prior films from January of 2008. (AR at 232, 389.) Dr. Light suggested that the Plaintiff seek another opinion from Dr. Helfet concerning possible surgical intervention. (AR at 232, 389.)

On March 31, 2008, the Plaintiff visited Dr. Helfet. (AR at 184.) Dr. Helfet noted significant improvements in the Plaintiff, even though she still complained of some continuing pain and discomfort. (AR at 184.) The Plaintiff also reported back pain on her left side, but told Dr. Helfet that she was taking Advil and that the pain had "significantly improved." (AR at 184.)

Following a physical examination, Dr. Helfet reported that the Plaintiff was "neurovascularly intact." (AR at 184.) In addition, he observed that while the Plaintiff walked with a "slight antalgic gait," she expressed no complaints of any pain while walking. (AR. at 184.) Dr. Helfet recommended that the Plaintiff "continue conservative management." (AR at 184.) He opined that if her pain persisted after two to three months, she could consider undergoing surgery. (AR at 184.)

Four and a half months later, on August 15, 2008, the Plaintiff visited Dr. Light. (AR at 221, 234.) Based on the x-rays, Dr. Light did not note any significant interval changes in the Plaintiff's lumbar spine and pubic diastasis. However, the Plaintiff was having trouble sitting or standing for prolonged periods of time and admitted to "having symptoms of urinary incontinence." (AR at 221, 234). Further, in a "Physician's Supplementary Certification," dated August 15, 2008, Dr. Light described the Plaintiff's condition as "damage to pelvic joints" and that her impairment prevented her from returning to regular and customary work because she was "unable to sit or stand for prolonged periods." (AR at 221.) Dr. Light advised the Plaintiff to follow up with her obstetrician/gynecologist ("OB/GYN") and was "given the name of a spine specialist" named Dr. Brandoff. (AR at 234).

On October 29, 2008, the Plaintiff returned to Dr. Light's office for a follow up exam. (AR at 235, 390.) During this visit, she informed Dr. Light that she was three months pregnant. (AR. at 235, 390.) Further, she told Dr. Light that she occasionally experienced lower back pain, and she inquired about the status of her pelvis with respect to her new pregnancy and upcoming delivery. (AR at 235, 390.) Dr. Light reported that the Plaintiff planned to follow up with her OB/GYN and that "no further orthopedic intervention or treatment [was] recommended at [that] time." (AR at 235, 390.)

About a month later, on November 26, 2008, Dr. Light completed a medical source statement. He indicated that he had treated the Plaintiff for pelvic pain, but he stated that he was unable to provide a medical opinion concerning the Plaintiff's ability to do work-related activities. (AR at 204–08.)

On December 12, 2008, the Plaintiff's OB/GYN, Dr. Richard J. Trongone, MD ("Dr. Trongone"), also completed a written

medical source statement. He noted that the Plaintiff was pregnant. Further, he indicated that she was experiencing symptoms of pubis symphysis pain, which she was treating with Tylenol and modified bed rest. (AR at 193–94.) In this regard, Dr. Trongone described the Plaintiff's pain as "severe" and requiring bed rest. (AR at 195.) According to Dr. Trongone, the Plaintiff was limited to lifting and carrying no more than ten pounds and standing and walking no more than six hours per day. (AR at 196). She was also limited with respect to pushing and pulling. (AR at 196.) However, she could sit without limitation. (AR at 196.) Dr. Trongone noted that "delivery of [her] baby" was "significant to recovery." (AR at 196.)

On March 3, 2009, in connection with her claim for Social Security disability benefits, the Plaintiff was examined by a "Disability Examiner–DDS [Disability Determination Services]" whose name was "L Virella" ("Virella"). (AR at 50.) It is not clear what, if any, medical background or credentials Virella had, but it appears that he was not a doctor. Virella completed a physical residual functional capacity assessment for the Plaintiff (AR at 214–219.) He noted the following exertional limitations: (1) the Plaintiff was limited in the category of lifting and/or carrying, in that she could only occasionally and frequently lift and/or carry no more than ten pounds; (2) the Plaintiff was limited in the category of standing and/or walking, in that she could only stand and/or walk with normal breaks for a total of at least two hours in an eight hour workday; (3) the Plaintiff was limited in the category of sitting, in that she could only sit with normal breaks for a total of about six hours in an eight hour workday; and (4) the Plaintiff was limited in the category of pushing and/or pulling, in that her ability to push and/or pull, including the operation of hand and/or foot controls, was limited in the lower extremities. (AR at 215.) The Plaintiff informed Virella that she could not sit, walk or stand for too long, which he found to be "fully credible." (AR at 217.)

Virella based his conclusions with respect to the Plaintiff's exertional limitations on the fact that the Plaintiff "sustained separation of the pubis-symphysis" while delivering her first child on August 6, 2007. (AR at 215.) He indicated that the Plaintiff "underwent surgery with improvement, and [had] been on and off on Tylenol." (AR at 215.) In addition, he noted that the Plaintiff was again pregnant. (AR at 215.) In addition, Virella noted that Dr. Trongone believed the Plaintiff had a residual functional capacity for sedentary work, which Virella found to be "a reasonable appraisal." (AR at 215.) Based on this, Virella opined that under vocational rule 201.29, the Plaintiff's claim for social security disability benefits should be denied. (AR at 215.)

On May 6, 2009, the Plaintiff was admitted to North Shore University Hospital and underwent a cesarean section, which was performed by Dr. Trongone. (AR at 282–312.) Four days later, on May 6, 2009, the Plaintiff was discharged from the hospital. (AR at 288.) At the time of her discharge, she was using a walker but "ambulating well." (AR at 288.) However, her "symphyseal pain had persisted" and "she was discharged with a [pelvic] binder." (AR at 288.) She was also given a prescription for Percocet. (AR at 288.)

On November 21, 2009, the Plaintiff visited Dr. Edward Gabalski, MD ("Dr. Gabalski"), concerning intermittent dizzy spells she was experiencing. (AR at 327.) Dr. Gabalski specialized in otolaryngology, including head and neck surgery. (AR at 327.) In a letter to Dr. Linda Tepper, MD ("Dr. Tepper"), whose progress notes are apparently not part of the administrative

record, Dr. Gabalski explained that he recommended to the Plaintiff that she undergo a magnetic resonance imaging ("MRI") of her brain. (AR at 327.) Thus, on November 30, 2009, an MRI of the Plaintiff's brain was performed. (AR at 331.) The MRI showed a hyperintensity at the right aspect of the pituitary gland. (AR at 331.) Apparently, "[t]his may [have] represented a microadenoma or cysts[.]" (AR at 331.) The MRI was faxed to Dr. Tepper on December 4, 2009.

Two days after the Plaintiff's visit with Dr. Gabalski, on November 23, 2009, the Plaintiff met with Dr. Barry R. Shepard, MD ("Dr. Shepard"), a urologist, upon the referral of Dr. Tepper. According to Dr. Shepard, in a letter to Dr. Tepper, the Plaintiff "complain[ed] of day and nighttime [urinary] frequency, daytime 15 to 20 times, and nocturia seven to eight times per night." (AR at 322.) The Plaintiff "denie[d] any dysuria, hematuria, or urge incontinence[,]" but did have "stress incontinence." (AR at 322.) These symptoms had allegedly existed for about two years, since the time the Plaintiff gave birth to her first child in 2007. (AR at 322.)

Based on his exam of the Plaintiff, Dr. Shepard concluded that "there [was] not CVA tenderness or flank mass" and that "[t]he abdomen [was] was soft and nontender." (AR at 322.) The Plaintiff's bladder was not distended; no masses were palpable; no stress incontinence was demonstrated; and the urinalysis was negative. (AR at 322.) However, the Plaintiff's "[p]elvic exam reveal[ed] a small cystocele." (AR at 322.) Dr. Shepard's impression was that the Plaintiff had (1) an overactive bladder and (2) a cystocele. (AR at 322.) He prescribed for her five milligrams of Vesicare daily. (AR at 322.)

On December 18, 2009, the Plaintiff visited Dr. Gary Kaplan, MD, PhD ("Dr. Kaplan"), who specialized in neurology and integrative pain medicine, for an examination concerning her dizziness and the abnormality found in the MRI of her brain. (AR at 319–20, 329–30.) The Plaintiff informed Dr. Kaplan that since August of 2009, she had experienced several episodes of dizziness and spinning. (AR at 319.) These episodes lasted a few seconds each and occurred when "she was either rising to a standing position or occasionally while walking." (AR at 319–20.). She also had "headaches weekly for approximately a month and [a] half with headaches lasting up to four days but no headaches over the last two weeks; constipation[;] urinary frequency at night . . . [;] low back pain[;] and anxiety[.]" (AR at 319.)

In his initial office visit notes, Dr. Kaplan described the Plaintiff's neurologic evaluation as "unremarkable" and opined that her symptoms were being caused by "transient decreases in her blood pressure and cerebral perfusion." (AR at 320.) However, he directed the Plaintiff to receive a magnetic resonance angiogram ("MRA") of her head and a second MRI of her pituitary gland. (AR at 320.) Shortly thereafter, on January 11, 2010 the Plaintiff underwent the prescribed MRI of her pituitary gland and brain, which revealed a suspected pituitary cyst. She also underwent an MRA of her circle of Willis and neck, which were normal. (AR at 318.)

On January 18, 2010, the Plaintiff had a follow-up exam with Dr. Kaplan. (AR at 321, 328.) She informed Dr. Kaplan that her dizzy spells had not bothered her much, except for occasional headaches, for which Dr. Kaplan prescribed Midrin to take as needed. (AR at 321.) Dr. Kaplan determined that the Plaintiff's dizziness was being caused by "momentary decrease and cerebral perfusion related to relative hypotension." (AR at 321.) He asked the Plaintiff "to liberalize fluid and salt intake"

and advised her to follow up with him if the dizzy episodes continued. (AR at 321.)

On March 18, 2010, Dr. Emmanuel Lambrakis, MD ("Dr. Lambrakis") examined the Plaintiff. (AR at 225.) The administrative record does not indicate what area of medicine he specialized in. In his notes, he wrote that the Plaintiff had "severe bilateral sciatica" and "secondary pelvis separation." (AR at 225.) He directed the Plaintiff have a full pelvic x-ray performed, with attention to the pubic symphysis separation, as well as a stand-up MRI. (AR at 225.)

The Plaintiff had x-rays performed on March 23, 2010 and March 24, 2010. (AR at 223–24, 398–400, 408–09.) The first x-ray revealed a 2.9 centimeter diastasis of the pubis symphysis. (AR at 223, 400, 409.) The second x-ray showed that there were no gross abnormalities of the Plaintiff's lumbar spine. (AR at 224, 398–99, 408.)

On March 30, 2010, the Plaintiff was again examined by Dr. Lambrakis, who confirmed the diastasis of the pubic symphysis at 2.9 centimeters. (AR at 226.) He referred the Plaintiff to Dr. John Xethelis, MD ("Dr. Xethelis"), an orthopedic surgeon. (AR at 226, 313.)

On April 12, 2010, the Plaintiff was examined again by Dr. Shepard. (AR at 323–24.) He found that she had a small bladder capacity and was suffering from severe urgency. He also noted that the Vesicare he had prescribed her was not helpful. (AR at 323.)

On April 16, 2010, having been referred by Dr. Lambrakis, the Plaintiff visited Dr. Xethelis complaining that she was suffering from pain in her lower back and symphysis pubic area. (AR at 222, 226.) In an evaluation note, Dr. Xethelis stated that since giving birth to her second child in May of 2009, the Plaintiff was unable to

care for her children or to do the activities of daily living because of this pain. (AR at 222.) However, by this time, the Plaintiff was apparently no longer using a walker, although she had used one for five to six months following the initial onset of her injury. (AR at 222.)

Dr. Xethelis examined the Plaintiff, who was "in slight distress due to painful low back and symphysis pubic area[,]" as well as "anxious and nervous." (AR at 222.) He observed that "[t]he range-of-motion of the lumbar spine [was] slightly restricted due to paravertebral muscle spasm and tenderness." (AR at 222.) He further observed that "[s]tanding produce[d] pain in the symphysis pubic area which [was] exaggerated when [the Plaintiff] shift[ed] her weight from left to right." (AR at 222.) In addition "there [was] significant tenderness over the symphysis pubis with movement on shifting weight from one leg to the other." (AR at 222.) Following his examination, Dr. Xethelis recommended that the Plaintiff consider surgical intervention as a way to decreases the diastasis of the symphysis pubis. (AR at 222.)

On May 4, 2010, the Plaintiff had a return visit with Dr. Lambrakis. He provided her with a lumbar spine brace with metal support. (AR at 227.) He also requested that she get an MRI of her lumbar spine. (AR at 227.)

After the Plaintiff's August 8, 2010 hearing before the ALJ, on September 29, 2010, the Plaintiff visited Dr. Rohit Verma, MD ("Dr. Verma"), who specialized in orthopedic spine surgery, with complaints of severe neck and shoulder pain, which was exacerbated by any sort of activity, including lifting, bending, twisting, ambulating, doing work and taking care of her children. (AR at 402–403.) The Plaintiff indicated that this pain was "unbearable." (AR at 407.) According to his progress note, Dr. Verma assessed that the Plaintiff

had full motor strength in her upper and lower extremities, as well as deep tendon reflexes that were equal and symmetric (AR at 402.) A cervical x-ray revealed that the Plaintiff had good cervical lordosis and that there was no evidence of instability or disc degeneration. (AR at 402.) However, Dr. Verma found that the Plaintiff had "cervical radiculopathy" and "recommend[ed] ... that she get a Medrol DosePak, do physical therapy and return for further evaluation in 1 week." (AR at 402.)

### C. The August 9, 2010 Hearing Testimony

As stated above, on August 8, 2010, a hearing was held before the ALJ. (AR at 29–49.) At the hearing, the Plaintiff testified that she had not worked since April 2007, when she moved back to New York and was seven months pregnant.

According to the Plaintiff, she did not seek frequent treatment for her alleged impairment "because there's nothing much they can do" and that she went to see doctors for the pain medication. (AR at 34–35, 38.) She explained that while in the hospital after giving birth to her first child, she suffered from immense pain due to her pelvis separating. (AR at 35.) Following her discharge, she saw an orthopedic surgeon, Dr. Light, every two months and also went for physical therapy, which she did not find helpful because she was allegedly unable to move. (AR at 35.) She said she went to Dr. Light for about a year until she accidentally got pregnant again, at which point she stopped seeing him. (AR at 35.) Apparently, during her time as his patient, Dr. Light took x-rays of the Plaintiff's pelvis every two months in order to see if her pelvis had healed.

The Plaintiff testified that she had explored possible surgical intervention and was advised that her injury generally healed itself. (AR at 35–36.) However, she claims this did not happen in her case. (AR at 35–36.) According to the Plaintiff, her doctors suggested that the Plaintiff try to "live with the separated pelvis," but if she continued to have difficulties, she could undergo surgery. (AR at 36.) The Plaintiff further testified that the doctors would not guarantee that even with the surgery that she would get relief from her severe back pain and that there were some risks involved. (AR at 36.) She also explained that she did not have good insurance. (AR at 38.) To treat her pain, the Plaintiff used muscle relaxers for the spasms in her neck and back, but rarely took prescription pain medication because she wanted to avoid becoming addicted. (AR at 36.)

The Plaintiff gave the following reason for why she had not attempted to return to work:

> I know I can't do it, because I can't even do like regular activities at home. My family is always helping me out, washing my clothes, cleaning my house. Like when I'm standing for an hour or two, I get severe back pain, and I have soreness in my pelvis. At night when I'm sleeping, I have pain. I can't sleep on my back. I can't sleep on my side. Some morning I can't even get up. My husband has to help me get up, and I have to lay down. I don't know why that helps, but I lay down on the floor, some like hard surface, or I have a folding chair.

(AR at 37.) The Plaintiff expressed additional difficulties with bending down, putting pants on, taking a shower, walking and sitting at a computer. (AR at 37–39.) She relied on her family, especially her sister, to help her with her children. (AR at 37.) However, the Plaintiff admitted that she did not have the "severe pain when [she] move[d] around" like she used to and that she no longer needed a walker

as she had in the past. (AR at 37.) She was also able to drive a car, and took three or four trips a week. (AR at 39–40.) These trips usually required only ten to fifteen minutes of driving at time and were to the supermarket or to relatives' homes. (AR at 40.)

When asked by the ALJ if she would have any difficulty leaving her children and going to work even if she did not have her alleged injury, the Plaintiff responded that she would not, "because [she] [had] [her] in-laws and [her] family to take care [her] children." (AR at 37–38.) She also added that she "had [her] Bachelor's degree in accounting," meaning she would "make a lot of money to pay for a babysitter." (AR at 38.) The Plaintiff stated she wanted to work, but was prevented from doing so because she allegedly could not sit for hours or walk too long. (AR at 38–40.)

The ALJ explained to the Plaintiff that "[y]ou haven't been hospitalized, you haven't been to an emergency room, so that tells me something about the severity of your condition ... you have to understand that the definition of disability is one that pertains to a condition so severe that it will result in total disability for at least 12 months where you're confined to a bed or to the house, or it will result in death.... You're not in that category." (AR at 41.)

In addition, Dr. Gustoff, a medical expert, testified at the hearing. (AR at 44.) Dr. Gustoff testified at the request of the ALJ. (AR at 822, 824.) The record does not provide any details as to Dr. Gustoff's background in medicine.

Dr. Gustoff stated that he had reviewed the Plaintiff's claims file and listened to her testimony. (AR at 44.) According to Dr. Gustoff, the Plaintiff's major issue was pain, but that the x-rays in the administrative record were unremarkable, "except for the separation of the symphysis pubis,

which is well documented." (AR at 44.) Dr. Gustoff asserted that the Plaintiff's alleged impairments did not fall into any of the categories provided under 1.02, but that "[t]he closest ... is major dysfunction of the joints." (AR at 45.) However, he testified that the Plaintiff's impairment did not satisfy the requirements for a finding under this category because she did not have an inability to ambulate effectively and because she did not have reconstructive surgery. (AR at 45.) Dr. Gustoff declined to comment any further on the Plaintiff's ability to function. (AR at 46.)

### D. The ALJ's Findings

On September 21, 2010, the ALJ issued his decision. (AR at 20–25.) The ALJ addressed whether the Plaintiff was disabled under sections 216(i) and 223(d) of the Social Security Act. (AR at 20.) He also noted that the Plaintiff was required under sections 216(i) and 223 of the Social Security Act to establish that she was disabled on or before December 31, 2012, which was the date she was last insured for disability insurance benefits, in order to be entitled to a period of disability and disability insurance benefits. (AR at 20.) "After careful consideration of all the evidence, the [ALJ] conclude[d] the [Plaintiff] was not under a disability within the meaning of the Social Security Act from August 14, 2007, through the date of this decision." (AR at 20.)

In relevant part, the ALJ found that although the Plaintiff had the "severe impairments" of "separation of the pubis symphysis and low back pain," she nevertheless "[did] not have an impairment or combination of impairments that [met] or medically equal[ed] one of the listed impairments in 20 CFR Part 404[.]" (AR at 22.) In this regard, the ALJ noted,

[t]he medical expert testified that specific consideration was given to Listing

1.02 (major dysfunction of a joint(s) (due to any cause) characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability). The medical record establishes that the [Plaintiff] had no symptoms, physical signs, laboratory tests or abnormalities to establish a disorder that would meet or equal Listing 1.02.

(AR at 22.)

Further, the ALJ found as follows: "After careful consideration of the entire record, the [ALJ] finds that the [Plaintiff] has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b)." (AR at 22.) The ALJ explained that "[i]n making this finding, ... [he] considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical and other evidence," as well as opinion evidence. (AR at 22–23.) The ALJ pointed out that although "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[ ], the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR at 23.)

The ALJ went on to explain that

the [Plaintiff's] impairments would limit her ability to lift more than 10 pounds frequently. She could lift ten pounds frequently and stand, walk and sit for six hours per day. Light work as defined in the Regulations, involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category may not require a good deal of walking or standing, but when it involves sitting most of the time, it involves some pushing and pulling of arm or leg controls and hand and finger dexterity. Here, there is no indication that the claimant has lost any hand and finger dexterity, grip strength or gross manipulation in her hands. She has not required hospitalization, emergency room treatment or surgical intervention. Her medications have not been unusual for either type or dosage, and there is no indication that they have produced any adverse side effects. These medications have proved to be effective. The [Plaintiff] also engages in a reasonable range of daily living activities which are consistent with light work. She is independent in self-care, maintaining her household, taking care of two young children, driving and socializing. Her pain is controlled with medication and Dr. Trongone opined that she has no limitations with respect to sitting and is able to stand and/or walk up to six hours per day. Moreover, taking care of young children is an indication that she can bend, stoop, squat, kneel and perform the other postural activities consistent with light work. There is simply no evidence that she has any condition that would limit her ability to perform the various postural activities generally considered to be included in the definition of light work.

(AR at 24, citation omitted.)

The ALJ made an additional finding that "the [Plaintiff] is capable of performing past relevant work as an accountant which requires the residual functional capacity for sedentary work. This work does not require the performance of work-related activities precluded by the [Plaintiff's] residual functional capacity[.]" (AR at 25.) Accordingly, the ALJ found that "[b]ased on the application for a period of disability and disability insurance benefits filed on October 16, 2008, the [Plaintiff] was not

disabled under section 216(i) and 223(d) of the Social Security Act." (AR at 25.)

## II. DISCUSSION

### A. Standards of Review

An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. §§ 405(g), 1383(c)(3). When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir.2003); *Brown v. Apfel*, 174 F.3d 59, 61–62 (2d Cir.1999); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir.1999). Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), and requires such relevant evidence that a reasonable person "might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).

In addition, the Commissioner must accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques; results from frequent examinations; and is consistent "with the other substantial evidence in [the] case record." *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). When the Commissioner chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice of determination or decision for the

weight he gives the claimant's treating source's opinion." *Id.*

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.1983). Further, the Court must keep in mind that "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark*, 143 F.3d at 118. Therefore, when evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)). A reviewing court may "enter upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decisions of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B. Analytical Framework for Determining Disability

To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir.2004). The Act also provides that the impairment must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy." *Id.*

Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity and ability to continue past relevant work despite severe impairment; and (5) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the last stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. *See* 20 C.F.R. §§ 404.1520, 416.920.

■ When proceeding through this five step analysis, the ALJ must consider the objective medical facts; the diagnoses or medical opinions based on these facts; the subjective evidence of pain and disability; and the claimant's educational background, age, and work experience. *Brown v. Appfel,* 174 F.3d 59, 62 (2d Cir.1999).

### C. As to Whether the ALJ Committed Reversible Error in Failing to Ensure that the Plaintiff Was Aware of Her Right to Counsel

■ The Plaintiff first contends that the ALJ committed reversible error by failing to advise the Plaintiff of her right to counsel and, therefore, on that ground, remand is required. In this regard, the Plaintiff contends that at the hearing, the ALJ did not adequately inquire as to whether the Plaintiff had received the requisite notice of her right to counsel.

■ "Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel." *Lamay v. Comm'r of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009) (citing 42 U.S.C. § 406 and 20 C.F.R. § 404.1705). In this regard, "the applicable statute and regulations state that, when notifying a claimant of an adverse determination [that her initial application for Social Security disability benefits had been denied], the Commissioner of Social Security (or his agent for these purposes) must 'notify the claimant in writing' of [ ] her 'options for obtaining an attorney to represent her'" should she choose to exercise her right to a request a hearing before an ALJ, as well as "'the availability ... of ... organizations which provide legal services free of charge' to 'qualifying claimants.'" *Id.* (quoting 42 U.S.C. §§ 406(c), 1383(d)(2)(D)) (internal brackets omitted) (ellipses in original). Further, "at the hearing itself, 'the ALJ must ensure that the claimant is aware of [her] right [to counsel].'" *Id.* (quoting *Robinson v. Sec'y of Health & Human Servs.,* 733 F.2d 255, 257 (2d Cir.1984)) (internal brackets in the original).

In this case, as discussed above, the ALJ stated, "[t]he record should also indicate that the [Plaintiff] was advised at all times by the Social Security Administration of her right to have representation. The fact that she appears here without the representation indicates that she wishes to go ahead with the hearing today." (AR at 31.) He then asked the Plaintiff whether this was correct, and she replied yes. (AR at 31.) In the Court's view, the statement by the ALJ is inadequate to satisfy the ALJ's duty to ensure that the Plaintiff was aware of her right to an attorney.

Of importance, "[t]he case law does not require an ALJ to inform a claimant of the right to be represented at a hearing, but instead to the right to be represented '*by counsel.*'" *Hynes v. Astrue,* 12–CV–719 JFB, 2013 WL 3244825, at *13 (E.D.N.Y. June 26, 2013) (quoting *Robinson,* 733 F.2d at 257) (emphasis added). Instructive here is the court's holding in *Holliday v. Astrue,* 05CV1826 DLI/VVP, 2009 WL 1292707, at *10–11 (E.D.N.Y. May 5, 2009). In *Holliday,* at the hearing, the ALJ advised the claimant that "[i]f during the hearing ... I'm not explaining to you what's going on or you're getting confused or you fill [sic] uncomfortable, please let me know. I can always cancel the hearing and ... let you have a chance to go out and find a representative[.]" *Id.* at *11. When the claimant replied that she did not believe she needed one, the ALJ went on to say "I'm going to go and enter into the record that you're proceeding, from the documentary standpoint and otherwise, without a representative. When someone doesn't name a representative, I try to explain carefully what this is all about, because I think everybody has a right to know how important these hearings are." *Id.* at *11.

The *Holliday* court found that the ALJ's statements were insufficient to satisfy his obligation under the case law to ensure the Plaintiff was aware of her right to counsel. *Id.* Specifically, the court held that "[a]lthough [the claimant] received written notification of the right to counsel in a letter she received prior to the hearing, the ALJ's discussion with [the claimant] at the hearing did not ensure that Plaintiff 'was sufficiently informed of her right to counsel and knowingly and voluntarily waived that right at the hearing before the ALJ.'" *Id.* (quoting *Lamay,* 562 F.3d at 510). The *Holliday* court emphasized that "[t]he ALJ made no effort to confirm that the [claimant] actually understood his oblique

reference to legal counsel as 'a representative,' or that counsel could represent her for a fee or on a *pro bono* basis." *Id.*

Similarly, in this case, despite the sufficiency of the mailings sent by the SSA to the Plaintiff concerning her right to be represented, the ALJ nevertheless failed to ensure that the Plaintiff was aware she had the right to proceed at the hearing with counsel and that she was knowingly and voluntarily waiving that right. In this regard, the ALJ only referred to the Plaintiff's right to have "representation" without making clear that he was referring to representation by a lawyer. He also did not advise the Plaintiff that she could be represented by an attorney for a fee or on a *pro bono* basis.

Also instructive is the court's decision in *Hynes,* 2013 WL 3244825, at *13. In *Hynes,* the Court found that "the ALJ's failure to inform [the] plaintiff of his right to counsel because [the] plaintiff was represented by his wife and the ALJ explained to her some basic tenets of social security law does not satisfy the requirement" that an ALJ inform a claimant of the right to be represented by counsel. *Id.* Thus, even though the plaintiff did have a non-attorney representative present at the hearing, the *Hynes* court still found that the ALJ had not satisfied his duty because he never mentioned that the plaintiff had a right to counsel. *See also Collado v. Astrue,* 05–CV–3337 KMK/ LMS, 2009 WL 2778664, at *11–12 (S.D.N.Y. Aug. 31, 2009) ("[T]he colloquy between the ALJ and the Plaintiff is devoid of any discussion of [the] [p]laintiff's right to obtain representation save for the ALJ's decision to 'accept the [p]laintiff's statement that she would like to go on as a waiver of her right to representation.' The ALJ did not inquire into whether [the] [p]laintiff understood that she could retain representation free of charge or whether

she was electing to proceed *pro se* willingly.... Respectfully, the limited inquiry conducted by the ALJ into the Plaintiff's election to proceed *pro se* does not establish that [the] Plaintiff undertook such self representation knowingly[.]") (citations and internal brackets and ellipses omitted).

 For these reasons, the Court finds that the ALJ did not properly advise the Plaintiff of her right to be represented by an attorney at the hearing. However, "courts have concluded that '[r]emand for lack of representation is proper only if the lack of counsel resulted in prejudice to the claimant or unfairness in the proceeding.'" *Hynes*, 2013 WL 3244825, at *13 (E.D.N.Y. June 26, 2013). "Determining whether a claimant was prejudiced is 'bound up in the inquiry of whether the ALJ properly conducted the hearing and adequately developed the record' in the manner the Second Circuit requires in a *pro se* case." *Flores v. Astrue*, 2009 WL 1562854, at *8 (S.D.N.Y. May 27, 2009) (quoting *Rose v. Barnhart*, No. 01 Civ. 1645(JSM), 2003 WL 1212866, at *4 (S.D.N.Y. Mar. 14, 2003)). "Where ... the claimant is proceeding pro se, the ALJ has a heightened duty to prevent prejudice to the claimant, and must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts surrounding the alleged right or privilege.'" *Id.* Further, "[i]n the pro se context, prejudice is shown where the ALJ neglected to develop properly the administrative record in a manner consistent with the heightened *pro se* standard." *Judge v. Astrue*, 09–CV4058 JS, 2011 WL 1810468, at *3 (E.D.N.Y. May 10, 2011)

Here, having examined the administrative record, in the Court's view, the Plaintiff has demonstrated that her lack of counsel at the hearing did result in prejudice to her. For example, the ALJ never advised the Plaintiff that she could cross-examine the medical expert, Dr. Gustoff,

even though "[c]ross-examination is a vital aspect of a Social Security administrative hearing, and medical expert testimony is critical[.]" *Edwards v. Astrue*, 3:10CV1017 MRK, 2011 WL 3490024, at *3 (D.Conn. Aug. 10, 2011). However, if the Plaintiff had proceeded with an attorney, the medical expert most likely would have been subject to cross-examination. Therefore, in this way, the Court finds that the Plaintiff was prejudiced by her lack of legal representation. *See, e.g., Phelps v. Astrue*, 06–CV–0491T, 2008 WL 2323358, at *1 (W.D.N.Y. June 2, 2008) ("I find that the ALJ committed legal error by failing to inform the plaintiff, who appeared *pro se* before him, of her right to cross examine the vocational expert.") (citing *Alvarez v. Bowen*, 704 F.Supp. 49, 52 (S.D.N.Y. 1989)); *Rodriguez v. Apfel*, 96 CIV. 1132(LBS), 1997 WL 691428, at *4 (S.D.N.Y. Nov. 4, 1997) ("[The] heightened obligation to scrupulously develop the record in *pro se* cases involves, inter alia, .... the duty to instruct the claimant of his right to subpoena and cross-examine physicians.") (citing *Cullinane v. Secretary of Health & Human Servs.*, 728 F.2d 137, 139 (2d Cir.1984)).

Moreover, the ALJ gave erroneous statements of law during the hearing. For example, as mentioned above, he stated "You haven't been hospitalized, you haven't been to an emergency room, so that tells me something about the severity of your condition ... you have to understand that the definition of disability is one that pertains to a condition so severe that it will result in total disability for at least 12 months where you're confined to a bed or to the house, or it will result in death.... You're not in that category." (AR at 41.) Further, in his September 21, 2010 decision, the ALJ considered the Plaintiff's lack of "hospitalization, emergency room treatment or surgical intervention," as well

as her ability to complete some basic daily activities as reasons to find the Plaintiff had the residual functional capacity to perform the full range of light work. (AR 22–24.)

However, "[t]he Second Circuit has repeatedly recognized that '[a] claimant need not be an invalid to be found disabled.'" *Colon v. Astrue,* 10–CV–3779 KAM, 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) (quoting *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir.1988)) (internal brackets in the original). "Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'" *Valet v. Astrue,* 10–CV–3282 KAM, 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012) (quoting *Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y.2000)); *see also Mitchell v. Colvin,* 09–CV–5429 ENV, 2013 WL 5676289, at *7 (E.D.N.Y. Oct. 17, 2013) ("[E]vidence of a claimant's ability to complete household chores does not defeat a claim for disability, 'as people should not be penalized for enduring the pain of their disability in order to care for themselves.'") (quoting *Woodford,* 93 F.Supp.2d at 529).

As such, in the Court's view, had the Plaintiff been represented by a lawyer at the hearing, he or she would have corrected the ALJ's misunderstanding that the Plaintiff needed to be confined to her bed or home; be hospitalized; have visited the emergency room; have had a condition that would result in death; and/or be unable to do any daily activities in order to qualify for social security disability benefits. Also, as stated above, without doubt, counsel would have cross-examined Dr. Gustoff.

Finally, it appears that the administrative record was never fully developed. In this regard, even though the Plaintiff was apparently treated by Dr. Tepper, none of her medical records were included as part of the administrative record. Although the hearing was held on August 9, 2010, it seems that the only medical source statements in the administrative record were from November and December of 2008. It does not appear that the ALJ ever advised the Plaintiff that it would be important for her to submit a medical source statement from her current treating physicians, such as Dr. Lambrakis or Dr. Xethelis. *Battaglia v. Astrue,* 11 CIV. 02045 BMC, 2012 WL 1940851, at *7 (E.D.N.Y. May 29, 2012) ("First, district courts within this Circuit have routinely recognized that ALJs have an affirmative duty to request medical source statements from a plaintiff's treating sources in order to develop the record, regardless of whether a plaintiff's medical record otherwise appears complete."); *cf. Roach v. Colvin,* 5:12–CV–992 GLS/ATB, 2013 WL 5464748, at *6 (N.D.N.Y. Sept. 30, 2013) ("[B]y advising plaintiff's counsel of the importance of a medical source statement from a doctor treating plaintiff's mental health issues and keeping the administrative record open for a reasonable time so that such a statement could be submitted, the ALJ more than met his legal obligation to develop the record in this case.").

Accordingly, the Court finds that (1) the ALJ failed to adequately ensure that the Plaintiff was aware of her right to be represented by an attorney and that she was knowingly and voluntarily waiving that right and (2) that the Plaintiff's lack of counsel was a source of prejudice to her. Therefore, remand is appropriate in this case and the court need not address the parties' other arguments. *See Robinson,* 733 F.2d at 257 ("As we agree with [the plaintiff's] second argument that he was not accorded a fair hearing, we find it unnecessary to consider his first and third

arguments."); *Edwards,* 2011 WL 3490024, at *11 ("As remand is warranted on the basis that the medical expert testified telephonically, there is no need to reach the merits of [the plaintiff's] other claims."); *Phelps,* 2008 WL 2323358, at *1 ("Because of the legal errors committed by the ALJ, this case is remanded for a new hearing, and full development of the plaintiff's medical record.").

## III. CONCLUSIONS

For the foregoing reasons, it is hereby:

**ORDERED,** that the Commissioner's motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is denied; and it is further

**ORDERED,** that the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is granted only to the extent that the Court finds that (1) the ALJ failed to properly ensure that the Plaintiff was aware of her right to counsel during the hearing and knowingly and voluntarily waived that right and (2) the Plaintiff's lack of legal representation prejudiced her; and it is further

**ORDERED,** that this case is remanded to the ALJ for another hearing consistent with this Memorandum of Decision and Order. Specifically, on remand, the ALJ must advise the Plaintiff at the beginning of the hearing that she has a right to proceed represented by an attorney and the avenues by which she can obtain a lawyer. Further, in the event the Plaintiff decides to proceed pro bono, the ALJ must confirm that the Plaintiff is knowingly and voluntarily waiving her right to counsel; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**